Patrick A. McKENNA, Plaintiff,

v.

Floyd A. WALLIS and Pan–American Petroleum Corporation, a corporation, Defendants.

PAN AMERICAN PETROLEUM CORPORATION, Plaintiff,

v.

Floyd A. WALLIS, Defendant.

Civ. A. Nos. 8904–B, 8937–B.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 26, 1961.

MacCracken, Collins & Whitney, Philip R. Collins, Courtney Whitney, Jr., Washington, D. C., Edmond G. Miranne, New Orleans, La., for Patrick A. McKenna.

Cobb & Wright, Lloyd J. Cobb, Joseph V. Ferguson, II, William P. Hardeman, Percy Sandel, New Orleans, La., for Pan American Petroleum Corp.

Henican, James & Cleveland, C. Ellis Henican, New Orleans, La., Horace M. Holder, Shreveport, La., for Floyd A. Wallis.

WRIGHT, District Judge.

These cases involve rights in a mineral lease covering about 830 acres on the oil-rich banks of Southwest Pass, one of the mouths of the Mississippi River, around the community of Burrwood in southernmost Louisiana. The common defendant, Wallis, holds his lease from the United States. He did not come by it without a fight.[1] Nor is his title yet

---

1. The history of his contest with Morgan, a prior applicant before the Department of the Interior, is a long one. There was an initial skirmish over the "acquired lands" filings, which Wallis lost. Then the terrain shifted to the "public domain" applications and Wallis succeeded in obtaining a preliminary ruling voiding Morgan's prior filing for technical defects. But Morgan did not acquiesce in defeat. An elaborate rehearing before the Director of the Bureau of Land Management delayed his final decision another year. Failing in that, Morgan appealed to the Secretary of the Interior. By this

* time Wallis had an additional opponent, Strom, a later applicant who claimed a superior description of the lands. From the Secretary's rejection of their claims, Morgan and Strom prosecuted an appeal to the United States District Court for the District of Columbia. Their motion for a preliminary injunction was denied and, on February 20, 1961, summary judgment was entered in favor of Wallis. Morgan v. Udall, D.D.C., Civil Action No. 3248–58, 2/20/61. The court is advised that an appeal from that decision is presently pending before the Court of Appeals for the District of Columbia.

secure.[2] But even if his triumph be short-lived, Wallis wants to enjoy it alone. The claimants here would spoil that hope. They assert a right to share in his victory. McKenna is his alleged co-adventurer, who claims a one-third interest in the lease; Pan American Petroleum Corporation demands an assignment of the lease under an option contract. Wallis admits the agreements, but insists they relate to another venture which came to naught. The present lease, he maintains, is the fruit of a different venture in which the claimants have no part.

The chronology of this controversy begins in early 1954. Wallis uncovered the acreage in question, apparently land of the United States on which no application for a mineral lease had been filed. He promptly communicated his "find" to McKenna, who was handling other matters for him in Washington before the Department of the Interior. In the meantime, another applicant, Morgan, submitted a lease offer covering at least portions of the lands involved. But Wallis nevertheless prepared his applications, five in number, and they were filed on June 2. In their collaboration on this venture, Wallis and McKenna worked out an agreement,[3] which was finally reduced to writing in a letter from Wallis dated December 27, 1954, approved by McKenna on January 3, 1955. Specifically referring to the applications already filed, the letter agreement recognizes in McKenna a one-third interest in those applications and in any lease to be issued thereunder.[4]

Three months later, after swift negotiations, Wallis, acting alone,[5] granted Pan American an option to acquire any lease issued to him pursuant to the still pending applications.

At this point, and for some months yet, everyone concerned[6] assumed the acreage in question was "acquired land" of the United States,[7] being

2. Besides the possibility of reversal on the pending appeal in the proceedings entitled Morgan v. Udall, supra, Wallis must ultimately face the claim of the State of Louisiana in separate proceedings before this court. State of Louisiana v. Floyd A. Wallis, et al., E.D.La., Civil Action No. 9046. In that suit, Louisiana asserts title to the land involved here and disputes the right of the United States to grant a lease covering that acreage.

3. Agreement was actually reached in a telephone conversation on March 18, 1954. However, relating as it did to immovables, that oral understanding did not then bind the parties. See Note 13, infra. Even now, though admitted under oath, it probably has no force in view of the requirement of "actual delivery" in verbal contracts affecting immovables. LSA–C.C., Art. 2275. But, in any event, since the date is not crucial and the oral contract is admitted only to the extent incorporated in the December 27 letter, we may rely on the written document as evidencing the agreement between the parties.

4. In view of the disposition here made, it is unnecessary to decide whether the agreement created a joint venture, or is more properly characterized as an agency coupled with an interest in view of the provision granting Wallis sole management of the undertaking. See Note 5, infra. In any case, as Wallis admits, the agreement was effective to transfer to McKenna an interest in the then pending applications and any lease issued thereunder.

5. No question is raised as to Wallis' authority to contract alone with respect to such a lease in view of the stipulation in his agreement with McKenna that "all dealings in connection with these leases shall be at [Wallis'] sole discretion and direction." McKenna complains only of Wallis' alleged misrepresentations touching on the execution of the option contract and his failure to share the $8,300 option payment received from Pan American.

6. While Pan American's attorney in the option transaction, Sandel, claims to have adverted to the possibility that the acreage in question might be classified as public domain land of the United States, the evidence is clear that he personally believed it was acquired land.

7. "Acquired land," as the term implies, is land obtained by the United States through purchase or other transfer from a state or a private individual and normally dedicated to a specific use. Land owned by the United States by virtue of its sovereignty is called "public domain land."

apparently accretion to a tract purchased by the Department of the Army from a Louisiana patentee.[8] Wallis had sought a lease under the Mineral Leasing Act for Acquired Lands, 30 U.S.C.A. § 351 et seq., which applies only to such lands.[9] He had filed applications which would be ineffective if, as happened, the acreage were ultimately determined to be public land.[10] Neither McKenna nor Pan American demurred. On the contrary, both actively supported the acquired lands theory. It was only in late 1955 or early 1956 [11] that Wallis began to doubt he had guessed right about the character of the land.[12] Then, on the advice of new counsel, he submitted another application for the same tract under the "public domain lands" Mineral Leasing Act, 30 U.S.C.A. § 181 et seq. No new written agreements were entered into, nor were the old instruments amended. The question presented is whether McKenna and Pan American nevertheless acquired rights in the lease ultimately issued to Wallis under this fresh public domain application.

The issue is very narrow under the Louisiana rule that all "contracts applying to and affecting" "oil, gas, and other mineral leases" must be reduced to writing. LSA–C.C. Arts. 2275, 2440, 2462, via LSA–R.S. 9:1105.[13] Having

8. The acreage in question is contiguous to a tract patented to Jergens by the State of Louisiana in 1898 and 1903, and sold by him in the latter year to the United States. The assumption of the parties apparently was that the area covered by the applications, being river alluvion formed by accretion or dereliction after this transaction, inured to the United States, as the then owner of the banks, see LSA–C.C. Arts. 509, 510, under the same title as it held the banks, i. e., as "acquired land." Ultimately, the Director of the Bureau of Land Management, whose conclusions were affirmed by the Secretary of the Interior and also, apparently, by the District Court for the District of Columbia, determined that title to the Jergens tract never passed to the State of Louisiana, but that it was a "mud lump" which, together with all accretions thereto, including the present acreage, always was, and remains, public domain land of the United States.

9. The original Mineral Leasing Act of 1920, 30 U.S.C.A. § 181 et seq., with certain exceptions not here relevant, applied only to public domain lands. See Justheim v. McKay, D.D.C., 123 F.Supp. 560, aff'd, 97 U.S.App.D.C. 146, 229 F. 2d 29. Enacted to remedy this deficiency, the 1947 Act in terms applies only to "acquired lands" not subject to lease under the 1920 statute. 30 U.S. C.A. §§ 351, 352. See McKenna v. Seaton, 104 U.S.App.D.C. 50, 259 F.2d 780, 781, n. 1.

10. The parties all agree on this point. Seaton v. Texas Company, 103 U.S.App. D.C. 163, 256 F.2d 718, must be restricted to its peculiar facts.

11. A dispute rages between McKenna and Wallis as to whether the realization that the land might be characterized as public domain resulted from one or another of two conferences held at the Department of Interior, or originated with Edelstein, the new attorney retained by the parties. But it is unnecessary to resolve this conflict since the discovery, by mutual accord, occurred no sooner than November, 1955, nor later than February, 1956.

12. At the very outset, Wallis had apparently considered the acreage involved public domain land. But he quickly abandoned that position and accepted the view that it was acquired land, without further question until the end of 1955.

13. While the legislative declaration that rights in mineral leases are "real rights and incorporeal immovable[s]," LSA– R.S. 9:1105, has not always been given full effect, see, e. g., Reagan v. Murphy, 235 La. 529, 105 So.2d 210; Tinsley v. Seismic Explorations, Inc., 239 La. 23, 117 So.2d 897; Hodges v. Long-Bell Petroleum Company, 240 La. 198, 121 So. 2d 831 (on rehearing); Harwood Oil & Mining Company v. Black, 240 La. 641, 124 So.2d 764, the Louisiana Supreme Court has been consistent in reading § 1105 as requiring that contracts affecting such rights comply with the statute of frauds. Arkansas Louisiana Gas Co. v. R. O. Roy & Co., 196 La. 121, 198 So. 768; Davidson v. Midstates Oil Corporation, 211 La. 882, 31 So.2d 7; Wier v. Glassell, 216 La. 828, 44 So.2d 882; Acadian Production Corp. of Louisiana v. Tennant, 222 La. 653, 63 So.2d 343. The rule applies to McKenna's agree-

failed to obtain new written agreements,[14] each of the plaintiffs is compelled to rely on a single instrument. McKenna's claim is imprisoned in the letter agreement of December 27, 1954 —January 3, 1955; Pan American's claim is confined to the language of the March 3, 1955 option. Except as it throws light on their original intent, the conduct of the parties after those dates is irrelevant. Any new understandings reached in 1956, 1957, 1958 or 1959 are unenforceable in the absence of a writing. Nor does it matter whether Wallis obtained his lease by breaching his trust, as alleged. If the claimants acquired an interest in the lease, it is under the written instruments, not by virtue of any subsequent estoppel.[15] Accordingly, we turn to those instruments.

■ The letter which incorporates the agreement between Wallis and McKenna, after particularly listing and identifying certain numbered lease applications, being those filed by Wallis under the Mineral Leasing Act for Acquired Lands, confirms in McKenna "a ⅓ undivided interest *in the above captioned oil and gas lease applications * * ** [and] such lease or leases as may be issued * * * *under these captioned applications * * "* (emphasis added). Similarly, the agreement with Pan American recites the same five pending applications and grants the company "the right and option * * * to acquire any and all oil and gas leases which may be issued * * * *under and by virtue of the above referred to applications."* (Emphasis added.) Much is made of a second paragraph of the option agreement where Wallis promises, in general terms, to "make diligent efforts" to obtain a lease over the lands covered by the applications. But that provision does not purport to enlarge the scope of the grant.[16] Thus, both instruments speak

---

ment, whether it is considered as creating a joint venture or an agency relationship. See Stack v. De Soto Properties, 221 La. 384, 59 So.2d 428, 430–431; LSA–C.C. Art. 2992. So does it apply to Pan American's option contract. LSA–C.C. Art. 2462.

Since the requirement that such contracts be in writing may affect the very existence of a cause of action or, at least, significantly affect the result, the Rule of Decision Act, 28 U.S.C. § 1652, as interpreted in Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S. Ct. 1464, 89 L.Ed. 2079, compels adherence to the local law, in disregard of the more liberal policy of F.R.Civ.P. Rule 43(a), 28 U.S.C. Macias v. Klein, 3 Cir., 203 F.2d 205; cf. Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56. See also, Zacharie v. Franklin, 37 U.S. (12 Peters) 151, 9 L.Ed. 1035; Grafton v. Cummings, 99 U.S. (9 Otto) 100, 25 L.Ed. 366; Moses v. Lawrence County Bank, 149 U.S. 298, 13 S.Ct. 900, 37 L.Ed. 743.

14. Despite repeated contacts with him during three and a half years preceding issuance of the lease, Pan American claims not to have known about the new application filed by Wallis, and, accordingly, says it had no occasion to ask for revision of its option contract. But such knowledge is, of course, irrelevant. Pan American is not here penalized for negligence. Either the orig-inal agreement applies to the lease issued, in which case no amendment was necessary; or it does not, in which case Wallis might properly have refused to revise the contract.

McKenna, on the other hand, knowing of the new application, immediately sought from Wallis written confirmation of his interest in any lease that might issue thereunder. The very next day after it was filed he transmitted to Wallis for execution a power of attorney covering the public domain application which acknowledged his supposed interest. Wallis refused to sign the instrument and shortly "discharged" McKenna.

15. See Scurto v. Le Blanc, 191 La. 136, 184 So. 567; Pan American Production Co. v. Robichaux, 200 La. 666, 8 So.2d 635; Wier v. Glassell, supra; Blevins v. Manufacturers Record Publishing Co., 235 La. 708, 105 So.2d 392, 414 (on rehearing), and cases there cited. Of course, if Wallis did in fact breach his agreements, he may be answerable in damages or compelled to make restitution. LSA–C.C. Arts. 1926, 1928, 1930–1934. But neither dissolution of the contracts, nor damages, are prayed for here. This is a suit for specific performance only.

16. Paragraph II of the option contract reads:
"Wallis agrees to make diligent efforts to acquire leases on, to acquire the right to lease all lands described in the above

exclusively of an acquired lands lease. Was this an oversight?

■ With scant excuse,[17] the court permitted parol evidence to show the true intent of the contracting parties on the date the agreements were executed. But, not surprisingly, the documents and testimony produced only confirmed the indication of the written instruments that on January 3 and March 3, 1955, no one contemplated issuance of a lease to Wallis except in pursuance of the then pending acquired lands applications. That was all they talked about. And, quite naturally, that is all they put into their agreements.[18] Doubtless, McKenna and Pan American were both anxious to share in *any lease* Wallis might obtain over these lands. At the time, however, they saw only one means of achieving that end. Had they anticipated the ultimate issuance of a public domain lease, perhaps they would have purchased an interest in that contingency too. But that is a futile speculation. Obviously they cannot be said to have intended to buy a share in a future they did not even advert to. The conclusion must be that the written agreements faithfully record what was in the minds of the parties. Accordingly, there is no pretext for a strained construction or for reformation of the instruments. These instruments, taken alone or illumined by parol evidence, limit the claims of McKenna [19]

referred to applications and to obtain the issuance of leases to him covering all of said lands."

Standing alone, this provision would convey nothing. It merely imposes an additional duty, supplementing the fundamental obligation recited in the first paragraph. Nor does it throw light on the subject matter of the contract. On the contrary, being a mere accessory stipulation, its apparently general terms must be considered qualified by paragraph I, which indicates precisely "the things concerning which * * * the parties *intended to contract.*" LSA–C.C. Arts. 1959, 1961. See State ex rel. Ditch v. Morgan's Louisiana & T. R. & S.S. Co., 111 La. 120, 35 So. 482; Dufrene v. Bernstein, 195 La. 575, 197 So. 236.

As to Sandel's claim with respect to paragraph II, see Note 18, infra.

17. The general rule, of course, is that, while extrinsic evidence is inadmissible when the words of the agreement are unambiguous, LSA–C.C. Arts. 1945(3), 1963, 2276, in case of doubt the court should consider what the parties said, or wrote, or did, in pursuance of their agreement. LSA–C.C. Arts. 1949, 1950, 1956. Here, the contracts may be thought unambiguous, but, in view of the liberal rule adopted by the Louisiana courts, see Plaquemines Oil & Development Co. v. State, 208 La. 425, 23 So. 2d 171, 174; Gulf Refining Co. v. Garrett, 209 La. 674, 25 So.2d 329, 338–339 (on rehearing); Rosenthal v. Gauthier, 224 La. 341, 69 So.2d 367, 369; Simmons v. Hanson, 228 La. 440, 82 So. 2d 757, 758–759, and, in the absence of a jury, it seemed "a reasonable, common sense exercise of judicial discretion * * * to give the benefit of the doubt to the proponent of the offered evidence, in order to avoid a remand and retrial and in the interest of determining truth through trial." Elkins v. Townsend, 5 Cir., 296 F.2d 172, 177. See also, F.R.Civ.P. Rule 43(c).

18. Indeed, Wallis' letter to McKenna, which embodies their agreement, traces almost literally the language of McKenna's prior letter requesting written confirmation of his interest.

Though Campbell, the Pan American agent who negotiated the option "deal" with Wallis, makes no such claim, Sandel, the attorney who drafted the contract, insists that paragraph II of the contract was inserted, inter alia, to cover the contingency that a public domain lease might be issued to Wallis, after the latter alerted him to that possibility by mentioning that Morgan had filed both types of application. But all the evidence, including Sandel's own correspondence, contradicts that assertion. Moreover, it is difficult to understand why the draftsman was not more explicit if apprized of the contingency and intending to provide for it. Under the circumstances, the allegation must be rejected. See LSA–C.C. Art. 1958.

19. Insofar as McKenna performed services beyond the obligations of his contract which contributed to the eventual issuance of the public domain lease, he may be entitled to compensation on a quantum meruit basis, or under the theory of unjust enrichment. But that is no part of his prayer in the present proceeding.

and Pan American to the acquired lands applications.

It may be true, as plaintiffs suggest, that the lease ultimately granted, pursuant to the public domain application, is, from the lessee's point of view,[20] no different than one issued under an acquired lands offer. But that decides nothing. For so might a lease acquired by Wallis from the state or by assignment from Morgan, had the latter prevailed, be in all respects identical to the one in suit. Yet, clearly, neither McKenna nor Pan American could properly assert any interest in a lease obtained in that way. The important fact here is that the lease in dispute resulted from a new filing, based on a new theory, which was governed by a different statute and processed under different regulations.[21] The public domain application cannot be viewed as a mere amendment of, or substitute for, the old offers. It stands on its own feet, holding its own priority. And the new filing in no way cancelled or superseded the earlier applications. In effect, Wallis had two irons in the same fire, in only one of which McKenna and Pan American held an interest.

█ In short, in the administrative view, at least, the lease in question is wholly unconnected with the original acquired lands applications. Tempted as it might be to disregard technicalities, even a court of equity must recognize as a reality administrative rules and regulations which so vitally affect valuable rights.[22] Thus, here, the distinction made between acquired lands leases and public domain leases cannot be ignored, and the lease issued must be viewed as the fruit of a fresh undertaking, separate and apart from the venture in which the claimants had a part. It follows that, whatever remedies they may have in separate proceedings, if Wallis dealt unfairly with them,[23] neither McKenna nor Pan American acquired any interest in the lease in suit.[24]

Decree accordingly.

20. There are differences from the lessor's point of view. Compare, e. g., 30 U.S. C.A. § 191 with 30 U.S.C.A. § 355 with respect to the disposition of moneys received by the United States as lessor.

21. As already noted, lease of public domain lands is governed by the Mineral Leasing Act of 1920, 30 U.S.C.A. § 181 et seq., while lease of acquired lands is governed by the Mineral Leasing Act for Acquired Lands of 1947. The latter statute adopts the rules and regulations for public lands leasing "to the extent that they are applicable," 30 U.S.C.A. § 359, but, as a matter of fact, the regulations promulgated by the Secretary of the Interior are very different. Compare, e. g., 43 C.F.R. § 192.42–192.42a with 43 C.F.R. § 200.5–200.8. The particularity with which the acquired lands applications are listed and described in the instruments in suit demonstrates that the parties themselves were aware of this difference and appreciated its importance.

22. As Judge Hart observed during the hearing of Morgan v. Udall, supra: "These things get plumb technical." But, just as he did, so must this court give due weight to the administrative regulations, no matter how technical they may appear.

23. See Notes 15 and 19, supra.

24. Disposition on the grounds stated renders moot the other factual and legal issues raised. Accordingly, no finding is entered with respect to McKenna's alleged misrepresentation of his qualifications to practice before the Department of the Interior or his alleged failure to fulfill the obligations assumed under his contract with Wallis, and no conclusion is reached with respect to Pan American's apparent failure to exercise its option in writing. Nor is there any occasion to reconsider the preliminary rulings entered by order dated September 13, 1960, on Wallis' motion to dismiss.