WALLIS *v.* PAN AMERICAN PETROLEUM
CORP. ET AL.

No. 341. Argued February 23–24, 1966.—Decided April 25, 1966.

*C. Ellis Henican* argued the cause for petitioner. With him on the briefs were *Murray F. Cleveland* and *H. M. Holder.*

*Lloyd J. Cobb* argued the cause for respondent Pan American Petroleum Corp. With him on the brief were *Morris Wright* and *Percy Sandel. E. L. Brunini* argued the cause and filed a brief for respondent McKenna.

*Solicitor General Marshall, Assistant Attorney General Weisl, Richard A. Posner* and *Roger P. Marquis* filed a brief for the United States, as *amicus curiae.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

This case presents a question concerning "federal common law" best explained after a summary of the facts and the legal proceedings involved.

At stake in the litigation are rights in several tracts, aggregating 827 acres, of oil-rich "mud lumps" or islands owned by the United States and located in a mouth of the Mississippi River near Burrwood, Louisiana.[1]  In

---

[1] Louisiana is said to have challenged the title of the United States in another suit, see *McKenna* v. *Wallis,* 200 F. Supp. 468, 470, n. 2, but in this case the parties accept the premise of federal ownership.

1954 petitioner, Floyd Wallis, filed with the Secretary of the Interior applications for a lease to exploit oil and gas deposits in the tracts. Because the tracts were deemed by Wallis to be "acquired lands" of the United States rather than "public domain lands," these applications were filed under the Mineral Leasing Act for Acquired Lands, which governs the former, instead of the Mineral Leasing Act of 1920, which controls the latter.[2] Subsequently, Wallis entered into a written joint venture agreement with respondent Patrick McKenna giving McKenna a one-third interest in the pending applications and any lease issued under those applications. Then Wallis, who had exclusive management of the property under his agreement with McKenna, sold respondent Pan American Petroleum Corporation an option to acquire any lease Wallis might obtain under the applications then on file with the Secretary.

In 1956, fearing that the tracts might prove to be public domain land, Wallis filed new applications for the same tracts under the Mineral Leasing Act of 1920.[3] Thereafter the tracts were ruled to be public domain land, the conflicting applications of one or more competitors were rejected, and in 1958 the Secretary issued a lease of the tracts to Wallis under the 1920 Act. See *Morgan* v. *Udall*, 306 F. 2d 799. After the lease was issued to Wallis, McKenna brought a diversity action against him

---

[2] The Mineral Leasing Act for Acquired Lands is 61 Stat. 913, 30 U. S. C. §§ 351–359 (1964 ed.); the Mineral Leasing Act of 1920 is 41 Stat. 437, as amended, 30 U. S. C. § 181 *et seq.* (1964 ed.). While the precise distinction is of no concern here, in general acquired lands are those granted or sold to the United States by a State or citizen and public domain lands were usually never in state or private ownership.

[3] It appears that applications filed under the wrong Act are treated as ineffective, 200 F. Supp., at 471 and n. 10; see 43 CFR § 3212.1 (b) (1965), but that filing separate applications under each Act for the same land is allowed.

in Federal District Court in Louisiana seeking to be declared a one-third owner of the lease by virtue of the original joint venture agreement. Pan American also brought a diversity action in the same court to oblige Wallis to perform the option agreement by transferring the lease to Pan American.

The actions were consolidated, and following a nonjury trial the District Court held that neither McKenna nor Pan American was entitled to any interest in the disputed lease. 200 F. Supp. 468. The trial judge ruled that Louisiana law governed the rights of the parties and required a written agreement to create or transfer any interest in a mineral lease, thus excluding oral agreements as a basis for relief in this case. The judge then decided that the written agreements available to McKenna and Pan American contemplated they would share only in leases obtained by Wallis under the Mineral Leasing Act for Acquired Lands and not in any leases granted him under any other law. The court's judgment in favor of Wallis on the question of lease ownership reserved to McKenna and Pan American whatever rights they might have to damages, restitution, or like remedies based on oral agreements or other conduct.

Over a dissent, the Court of Appeals for the Fifth Circuit reversed, filing an initial opinion, 344 F. 2d 432, and after petitions for rehearing, a further opinion adhering to its earlier result, 344 F. 2d 439. The court decided only that the trial judge had erred in applying Louisiana law to the controversy and it remanded for a new trial in which "applicable principles of federal law" would control the issues. 344 F. 2d, at 437, 442. In its latter opinion the Court of Appeals reasoned that the Mineral Leasing Act of 1920 imposed pervasive federal regulation and that the Act's policies and the federal interest would be impaired if Louisiana law were to thwart the transfer of these federally granted leases. The opinion acknowl-

edged an apparent conflict with the Tenth Circuit's deci-sion in *Blackner* v. *McDermott,* 176 F. 2d 498.[4] We granted certiorari and invited the views of the United States, 382 U. S. 810, which filed a brief *amicus curiae.* We now reverse the Court of Appeals.

The question before us is whether in general federal or state law should govern the dealings of private parties in an oil and gas lease validly issued under the Mineral Leasing Act of 1920.[5] Several related matters in the case should be distinguished and laid aside at the outset.

First, we are not concerned with whether under *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, the Federal District Court might have diverged from state practice on the relevant issues of statute of frauds, parol evidence, estoppel, trust remedies, and so forth, on the ground that they were no more than "procedural" rules or fell under some similar rubric. See generally *Hanna* v. *Plumer,* 380 U. S. 460. Respondents do not argue that these rules are merely "housekeeping" matters on which state and federal courts may ordinarily differ but rather that the federal interest in government-granted mineral leases re-quires supplanting Louisiana law, in which event the federal rule would normally govern any such case whether in state or federal court. See *Dice* v. *Akron, C. & Y. R. Co.,* 342 U. S. 359. Second, apart from a pre-empting federal interest, we do not consider suggestions that some

---

[4] See also other arguably conflicting decisions in the Fifth, Ninth, and Tenth Circuits collected in 40 Tulane L. Rev. 195, 199, nn. 18–20.

[5] How possible federal rules would differ from those used by Louisiana has not been specified precisely. The Court of Appeals intimated that the devices of resulting and constructive trusts, said not to be recognized in Louisiana, might be available under federal law and useful to respondents. It may be thought that federal law would not embody a statute of frauds so oral understandings could be proved. In this instance, we believe the question of applicability of state versus federal law can be decided without further refinement of the issue.

law other than Louisiana's should govern because the land at issue may be outside the legal boundaries of the State and transactions between the parties may have occurred elsewhere. The District Court sitting in Louisiana obviously assumed that the State as a choice of law matter would apply its own law to the questions. See *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U. S. 487. If any challenge was offered on this point below, it has not yet been passed on by the Court of Appeals. Third, whether on the merits the trial court correctly interpreted and implemented Louisiana law is not before us; presumably that issue was presented to the Court of Appeals but not resolved because of its decision that federal law should apply.

We focus now on the central question in the case. In deciding whether rules of federal common law should be fashioned, normally the guiding principle is that a significant conflict between some federal policy or interest and the use of state law in the premises must first be specifically shown. It is by no means enough that, as we may assume, Congress could under the Constitution readily enact a complete code of law governing transactions in federal mineral leases among private parties. Whether latent federal power should be exercised to displace state law is primarily a decision for Congress. Even where there is related federal legislation in an area, as is true in this instance, it must be remembered that "Congress acts . . . against the background of the total *corpus juris* of the states . . . ." Hart & Wechsler, The Federal Courts and the Federal System 435 (1953). Because we find no significant threat to any identifiable federal policy or interest, we do not press on to consider other questions relevant to invoking federal common law, such as the strength of the state interest in having its own rules govern, cf. *United States* v. *Yazell*, 382 U. S. 341, 351–353, the feasibility of creating a judicial substitute, cf.

*U. A. W.* v. *Hoosier Cardinal Corp.,* 383 U. S. 696, 701, and other similar factors.

If there is a federal statute dealing with the general subject, it is a prime repository of federal policy and a starting point for federal common law. See *Deitrick* v. *Greaney,* 309 U. S. 190; *Reitmeister* v. *Reitmeister,* 162 F. 2d 691. We find nothing in the Mineral Leasing Act of 1920 expressing policies inconsistent with state law in the area that concerns us here. In providing for development of public domain lands containing minerals, the Act comprehensively regulates various aspects of the process. For example, it governs issuance of leases among competing applicants, *e. g.,* § 17 (b), (c), 30 U. S. C. § 226 (b), (c); it controls in some measure the actual use of the leased tract, to promote goals such as conservation and safety, *e. g.,* § 30, 30 U. S. C. § 187; and it deals with rent and royalty payments to be made to the Government, *e. g.,* § 17 (d), 30 U. S. C. § 226 (d). Few provisions lend themselves at all to the creation of a federal law of the rights *inter se* of private parties dealing in the leases.

Perhaps most prominent among those that are relevant is § 30a, 30 U. S. C. § 187a, which provides that oil and gas leases shall be assignable.[6] The Court of Appeals' opinion relied on this provision, together with reasons why assignment of leases may promote federal policy, in justifying the use of federal rather than state law. How-

---

[6] Other provisions that have something to do with transfer of lease rights are ones providing for surrender of leases to the Secretary, § 30, 30 U. S. C. § 187; for a time period in which persons may dispose of leases illegally held but involuntarily acquired, § 27 (g), 30 U. S. C. § 184 (g); and for protecting the rights of bona fide purchasers if the Secretary seeks to cancel a lease for violations of the Act, § 27 (h), 30 U. S. C. § 184 (h). Nowhere is it suggested how use of Louisiana law on the questions before us might interfere with policies behind these sections, whose provisions basically relate to the rights of private persons *vis-à-vis* the Secretary.

ever fitting this approach may be where a State interposes unreasonable conditions on assignability, it can have no force in this instance because Louisiana concededly provides a quite feasible route for transferring any mineral lease or contracting to do so, namely, by written instrument. See 200 F. Supp., at 471 and n. 13. Section 27 (d)(2), 30 U. S. C. § 184 (d)(2), also bears directly on the rights of the parties between themselves by rendering unenforcible any option not filed with the Secretary and any option running for more than three years without prior approval of the Secretary; however, this section enacts a pair of narrow, self-sufficient statutory defenses, which is no reason for creating at large a federal common law of federal mineral lease contracts among private interests.

Nor is respondents' position aided by the provisions fixing qualifications for lessees to the extent of curtailing alien ownership and limiting any lessee or option holder to a maximum number of acres.[7]   The Secretary, who must approve all assignments before the lease obligations or record titles are shifted finally, is entirely free to disapprove assignees however valid their assignments may otherwise be.[8]   Finally, it is said that because the leases are issued by the United States and concern

---

[7] §§ 1, 27 (d), 30 U. S. C. §§ 181, 184 (d).   Conceivably, the rights of private parties among themselves might be relevant data in deciding whether these sections were violated, e. g., whether an alien "controlled" a lease within the meaning of the statute; since the relevance would itself be decided by federal law, the federal interest is secure.

[8] Section 30a, 30 U. S. C. § 187a, requires approval unless the assignee is not qualified or fails to post the required bond.   Where there is a private dispute as to the validity or effect of an assignment, the Secretary does not decide the question and he will not approve the assignment or take other action until the parties settle their dispute in court. See *McCulloch Oil Corp. of California,* Int. Dept. Decision No. A–30208 (Nov. 25, 1964).

federal lands, there is a federal interest in having private disputes over them justly resolved. Apart from the highly abstract nature of this interest, there has been no showing that state law is not adequate to achieve it.

A concluding word must be said about precedents in this Court, which have been copiously cited in this litigation. The Court of Appeals in its initial opinion and at least one of the respondents in his brief have sought support in the general principle, repeated in a number of our cases, that the transfer of property by the United States to a private party is governed by federal law and only subsequent transfers among private parties are subject to state law. *E. g., Wilcox* v. *Jackson,* 13 Pet. 498, 517; *Buchser* v. *Buchser,* 231 U. S. 157. Notwithstanding the unchallenged grant of the lease to Wallis, it is apparently argued that this conveyed title subject to outstanding equities in favor of respondents and that federal law retains its initial hold on the lease until existing equities are resolved. The important case cited by respondents and the Court of Appeals for this approach, which would presumably confine federal law to governing equitable obligations of the lessee arising prior to his receipt of the lease, is *Irvine* v. *Marshall,* 20 How. 558. In that case an agent who had purchased land in his own name on behalf of two principals refused to convey one of the principals his interest; although local law aimed to discourage undisclosed purchases by proxy by refusing to enforce such equitable claims, this Court held that federal law displaced local law and ordered that a trust be recognized.

We take the decision in *Irvine* to rest on its most precise explanation: that enforcement of the equitable claim was required because the local rule discouraged purchasing through agents and so threatened to hamper the Federal Government in selling its land. 20 How., at 562. While this appraisal of the interests may be debatable,

the use of federal law beyond the stage of the initial grant was explained by a specific federal interest found to conflict with local law. That no conflict exists in the present case has already been demonstrated. Other cases cited to us of federal equity courts resolving private disputes over government-granted property seem quite distinguishable, for example, because there was no asserted conflict with local law, *Massie* v. *Watts*, 6 Cranch 148, or because a government grant itself was flawed in some manner, see *Widdicombe* v. *Childers*, 124 U. S. 400.

Having concluded that federal law should not govern the present controversy, we vacate the judgment of the Court of Appeals and remand the case to that court so that it may consider any other contentions respondents may have urged, including their claim that they should prevail under Louisiana law.

*Vacated and remanded.*

MR. JUSTICE BLACK, substantially agreeing with the majority opinions of the Court of Appeals, would affirm its judgment.