**KENAI PENINSULA BOROUGH, Plaintiff,**

v.

**Cecil D. ANDRUS, Defendant.**

**STATE OF ALASKA, Plaintiff,**

v.

**Cecil D. ANDRUS et al., Defendants.**

**Civ. Nos. A76–94 & J76–3.**

United States District Court, D. Alaska.

Aug. 17, 1977.

Charles K. Cranston, Gallagher, Cranston & Snow, Anchorage, Alaska, for Kenai Borough.

Avrum Gross, Atty. Gen., State of Alaska by Frederick Boness, Asst. Atty. Gen., Juneau, Alaska, for plaintiff.

G. Kent Edwards, U. S. Atty., Anchorage, Alaska, for defendant.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on cross motions for summary judgment. The precise issue before the court is whether the distribution of revenues from mineral leases within the Kenai National Moose Range is

governed by the Mineral Leasing Act, 30 U.S.C. § 191, or 16 U.S.C. § 715s.

The Kenai National Moose Range was created by the reservation of land in the public domain.[1] From statehood until the events leading to this lawsuit the State of Alaska received mineral leasing revenues from the Kenai National Moose Range, pursuant to 30 U.S.C. § 191. Under that statute the State received 90% of the lease revenues, with the remaining 10% accruing to the United States as miscellaneous receipts. On July 29, 1975, the Comptroller General issued an opinion stating that mineral leasing receipts from wildlife refuges created by reservation, as well as receipts from wildlife refuges created by acquisition, were governed by the distribution scheme of 16 U.S.C. § 715s. The Comptroller General determined that 16 U.S.C. § 715s, as amended in 1964, required distribution of 25% of the net receipts from mineral leases on reserved refuges to the counties in which the refuge was located, with the remaining 75% distributed to the wildlife refuge fund. The State of Alaska objected to the Comptroller General's opinion, and upon reconsideration the original position was affirmed by the Comptroller General in an opinion issued on June 11, 1976.

On May 14, 1976, Kenai Peninsula Borough, the borough in which Kenai National Moose Range is located, filed suit against the Secretary of Interior seeking distribution of mineral leasing receipts in conformity with 16 U.S.C. § 715s. On July 8, 1976, the State of Alaska filed suit against the United States seeking distribution as provided by 30 U.S.C. § 191. The actions were consolidated on August 12, 1976, with jurisdiction founded on 28 U.S.C. § 1331(a). The facts are undisputed, and the controversy is purely one of statutory interpretation.

Before proceeding with the disposition of the motions it is necessary to outline the interplay of the statutes involved in this suit. As noted above, the Mineral Leasing

1. In general, reserved lands are lands which were never in state or private ownership while acquired lands are those granted or sold to the United States by a state or citizen. *Wallis v. Pan American Pet. Corp.*, 384 U.S. 63, 65 n. 2, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966).

Act of 1920, 30 U.S.C. §§ 181, 191, requires the United States to distribute 90% of mineral leasing receipts from public domain lands to the states. *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 65 n. 2, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966). Revenues from mineral leases on acquired lands of the United States are distributed under the Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351–359, which requires mineral lease receipts to

> "be paid into the same funds or accounts in the Treasury and . . . distributed in the same manner as prescribed for other receipts from the lands affected by the lease." 30 U.S.C. § 355.

Prior to the 1964 amendment, 16 U.S.C. § 715s, at least as interpreted by the State of Alaska and the Comptroller General, did not apply to mineral lease receipts on reserved public lands.[2] However, all non-mineral activity receipts from refuges were distributed under 16 U.S.C. § 715s. In summary, prior to 1964, receipts from activities on wildlife refuges were distributed in the following manner:

1. All non-mineral activity receipts were distributed 25% to the counties and 75% to a federal wildlife refuge fund;

2. Mineral leasing receipts from reserved lands were distributed 90% to the State of Alaska and 10% to a federal fund for miscellaneous receipts;

3. Mineral leasing receipts from acquired lands were distributed like refuge receipts from non-mineral activity—25% to the counties and 75% to the wildlife refuge fund.

In 1964, 16 U.S.C. § 715s(a) was amended to read:

> Beginning with the next full fiscal year and for each fiscal year thereafter, all revenues received by the Secretary of the Interior from the sale or other disposition

of animals, timber, hay, grass, or other products of the soil, *minerals*, shells, sand, or gravel, from other privileges, or from leases for public accommodations or facilities incidental to but not in conflict with the basic purposes for which those areas of the National Wildlife Refuge System were established, during each fiscal year in connection with the operation and management of those areas of the National Wildlife Refuge System that are solely or primarily administered by him, through the United States Fish and Wildlife Service, shall be covered into the United States Treasury and be reserved in a separate fund for disposition as hereafter prescribed. (emphasis added).

At the same time, the distribution scheme was changed to differentiate between receipts from reserved lands and receipts from acquired lands. 16 U.S.C. §§ 715s(c)(1) and 715s(c)(2). The position of the United States and Kenai Peninsula Borough is that 16 U.S.C. §§ 715s(a), 714s(c)(1), as amended, requires that 25% of the mineral leasing receipts from reserved lands be distributed to Kenai Peninsula Borough. In contrast, the State of Alaska would have this court interpret the word "minerals" restrictively to apply only to acquired lands so that mineral leasing receipts from a wildlife reserve created by withdrawal of land from the public domain would be distributed 90% to the State of Alaska and 10% to the miscellaneous fund.

 The Kenai Peninsula Borough argues that prior to 1964 16 U.S.C. § 715s governed the distribution of mineral leasing receipts from public land. Specifically, Kenai Peninsula Borough argues that the language "other privileges" was intended to include mineral leasing receipts from reserved and acquired land. This interpretation ignores the fact that mineral leasing receipts from reserved land within wildlife

---

**2.** Prior to 1964, 16 U.S.C. § 715s(a) provided that 25% of money received by the United States "from the sale or other disposition of surplus wildlife, or sale of timber, hay, grass, or other spontaneous products of the soil, shell, sand, or gravel, and from other privileges on refuges established under the Migratory Bird

Conservation Act of February 18, 1929, or under any other law, proclamation, or Executive order, . . . shall be paid at the end of such year by the Secretary of the Treasury to the county or counties in which such refuge is situated, . . . ."

refuges generated prior to 1964 were in fact distributed under 30 U.S.C. § 191. Moreover, it ignores the fact that the government continues to adhere to its construction of 16 U.S.C. § 715s as it read prior to amendment.[3] Such a long-standing, contemporaneous, and practical interpretation by the executive officers charged with administration of a statute is strong evidence of the meaning of a statute. *Fleming v. Mohawk Co.*, 331 U.S. 111, 116, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947). *See generally*, Sutherland, Statutory Construction § 49.03, at 233 (4th ed. 1972). The borough cites obscure, often ambiguous evidence of a contrary administrative interpretation. The ambiguous material is consistent with the State of Alaska's position, and to the extent that the evidence contradicts the state's interpretation it pales in the face of the actual fact of distribution. Neither the legislative history nor the policy of management of the refuges requires a different result.

 Rejection of Kenai Peninsula Borough's interpretation of 16 U.S.C. § 715s(a) as it read prior to the 1964 amendment, of course, is only the beginning of the inquiry. The primary issue is whether 16 U.S.C. § 715s(a), as amended in 1964, should be construed literally or restrictively. The general rule of statutory construction is that there is no occasion for construction where the language is clear and unambiguous and does not lead to absurd or impracticable results. *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917). *See generally* Sutherland, Statutory Construction, § 46.01, at 48 (4th ed. 1972). In determining whether a statutory term is clear and unambiguous, the court generally looks to the Act itself to make a prima facie determination. *See Foley Bros. v. Filardo*, 336 U.S. 281, 284, 69 S.Ct. 575, 93 L.Ed. 680 (1949). *See generally* Sutherland, Statutory Construction, § 46.05, at 55–56

(4th ed. 1972). In the case at bar, there is nothing in 16 U.S.C. § 715s which would support a restrictive construction of the word "minerals". Thus, a literal approach to statutory construction would dictate an expansive definition including both reserved and acquired lands.

 However, there are limits to literalism. All statutes must be interpreted in light of their statutory purpose, and a literal reading which would be contrary to the legislative purpose is to be avoided if the statute can be read in a manner consistent with the words and purpose. *Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340 (1940). *See generally* Sutherland, Statutory Construction § 46.07, at 65 (4th ed. 1972). Where a literal interpretation would result in applications beyond the purpose for which the statute was enacted, courts construe the language restrictively in order to give effect to the spirit of the statute. *See generally* Sutherland, Statutory Construction, §§ 54.04, at 358, 54.06, at 368, 46.07, at 66 (4th ed. 1972).

 The primary purpose of the 1964 amendment of 16 U.S.C. § 715s was undoubtedly to facilitate the acquisition of waterfowl habitat areas. The Secretary of the Interior was authorized to acquire such land, but only if the governor of the state in which the land was located approved the acquisition. The governors generally refused to approve acquisitions because when land was acquired it was withdrawn from the tax rolls. Local communities were deprived of property tax revenues and would not benefit from the 25% distribution scheme if the land was not producing revenue. Consequently, the distribution scheme for acquired wildlife refuge land, 16 U.S.C. § 715s(c) had to be amended to facilitate acquisition. H.R.Rep.No. 1753, 88th Cong., 2d Sess. 1 (1964); S.Rep.No. 1096, 88th Cong., 2d Sess. 2 (1964), U.S.Code Cong. & Admin.News 1964, p. 3265.

---

**3.** On June 11, 1976, the Comptroller General held: "The Attorney General states, and we agree, that prior to the 1964 amendment, oil and gas lease revenues were not included in the coverage of 16 U.S.C. § 715s and that to the extent the counties benefited from oil and gas

lease revenues from wildlife refuges prior to 1964, it was only with respect to acquired lands, by virtue of 30 U.S.C. § 355, supra." Comptroller General B–118678, at 3 (June 11, 1976). See also Comptroller General B–118678, at 1–2 (June 11, 1976).

■ While the purpose of amending 16 U.S.C. § 715s(c) is clear, there is little evidence of the purpose behind adding "minerals" to the product list of 16 U.S.C. § 715s(a). If the court accepts Kenai's view this silence is surprising given the substantial reallocation of revenues which would result if the amendment did effect distributions from reserved lands. If the addition of "minerals" was intended to alter the distribution, one would expect mention of this fact in discussions which focused on 16 U.S.C. § 715s(a), and one would expect vigorous objection from the states. Cf. H.R. Rep.No. 1753, 88th Cong., 2d Sess. 77 (1964), U.S.Code Cong. & Admin.News 1964, p. 3265. More Equitable Payments to Counties Having Wildlife Refuges: Hearings on S. 179, S. 1363, S. 1720, and S. 2498 Before Committee on Commerce, 88th Cong., 2d Sess. 77 (1964). Of course, "the search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps-Howard Radio v. Comm'n,* 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942). The State of Alaska's restrictive reading, however, is supported by more than the mere silence of Congress. First, if Congress had intended to change the distribution scheme for mineral leasing revenues from reserved lands, the estimated payments to counties after the 1964 amendment would have substantially increased over past payments. However, no increase in payments to Kenai Peninsula Borough was projected in the cost estimate considered by Congress. The 1963 payments from the Kenai wildlife refuge receipts were $1,768. The estimated payments in 1963, assuming the 1964 amendment had been in force in 1963, were identical. H.R.Rep.No. 1793, 88th Cong., 2d Sess. 3 (1964); S.Rep.No. 1096, 88th Cong., 2d Sess. 13 (1964).

These estimated distributions were estimates for both acquired and reserved lands. This is evident from the inclusion of payments from the Kenai wildlife refuge in the projections. There is also explicit recognition of this fact in footnote 3 to the cost estimate.

Secondly, Congressional intent is evident in the Congressional expectation that the wildlife refuge fund would decrease if the 1964 amendment was adopted. H.R. Rep.No. 1753, 88th Cong., 2d Sess. 12 (1964). If mineral leasing receipts from public lands were intended to be distributed in conformity with 16 U.S.C. § 715s(c)(1), the wildlife refuge fund would have been substantially increased, and not reduced, as 75% of the mineral leasing receipts from reserved lands would have been reallocated to the wildlife refuge fund. Finally, it should be observed that the administrative agency charged with distribution of the fund distributed mineral lease revenues from public land for more than ten years after amendment as provided by 30 U.S.C. § 191. Only recently has the Secretary taken a contrary position.

Thus, this court concludes that the word "minerals" as used in the 1964 amendment of 16 U.S.C. § 715s(a) must be read restrictively rather than literally. The 1964 amendment of 16 U.S.C. § 715s(a) was not intended to amend 30 U.S.C. § 191 to require distribution of mineral leasing receipts from reserved land in accordance with 16 U.S.C. § 715s(c). To hold otherwise would require an application of literalism in violation of the apparent Congressional purpose. The interpretation adopted does not make "minerals" superfluous as 16 U.S.C. § 715s does continue to govern the distribution of mineral lease receipts from acquired land. Cf. Sutherland, Statutory Construction § 46.06, at 63 (4th ed. 1972). Moreover, this construction is consistent with the rule of construction disfavoring implied amendments. Sutherland, Statutory Construction § 22.13, at 139 (4th ed. 1972).[4]

Accordingly, IT IS ORDERED:

1. THAT the State of Alaska's motion for partial summary judgment is granted;

---

4. Because of this result the court is not required to determine: Whether section 317 of the Federal Land Policy and Management Act, in amending the Mineral Leasing Act of 1920, impliedly amended the 1964 amendment to 16 U.S.C. § 715s. Nor does the court need determine whether the 1964 amendment to 16 U.S.C. § 715s constitutes a breach of compact between the State and the United States.

2. THAT the cross-motions for summary judgment filed by Kenai Peninsula Borough and the United States are denied.

DATED at Anchorage, Alaska, this 17th day of August, 1977.