## NEW BEDFORD INSTITUTION FOR SAVINGS

### v.

### George A. CALCAGNI.

### No. 94–507–Appeal.

Supreme Court of Rhode Island.

May 20, 1996.

Richard L. Gemma, Robert D. Wieck, Providence, for Plaintiff.

Richard E. Fleury, Steven K. Parnagian, Providence, for Defendant.

## OPINION

WEISBERGER, Chief Justice.

This case comes before the court on an appeal by George A. Calcagni (Calcagni) from a summary judgment entered in the Superior Court in favor of the plaintiff, New Bedford Institution for Savings (New Bedford).[1] The judgment was in the sum of $136,998.10, plus post-judgment interest as provided by law, and represented a deficiency on two promissory notes that were in part secured by mortgages on real estate located in the city of Woonsocket. We deny and dismiss Calcagni's appeal and affirm the summary judgment. The facts of the case insofar as pertinent to this appeal are as follows.

On December 27, 1990, Calcagni borrowed the sum of $134,500 from the Attleboro–Pawtucket Savings Bank (Attleboro). In consideration of the loan Calcagni made a promissory note in this identical amount payable to Attleboro and also executed a mortgage as security for the note covering certain real estate located at 71–75 Arnold Street in Woonsocket. Thereafter, on January 9, 1991, Calcagni borrowed an additional sum of $85,500 from Attleboro and made a promissory note for said amount payable to Attleboro and further executed as security for the note a mortgage on real property located at 723 Bernon Street, Woonsocket.

---

1. New Bedford Institution for Savings has by assignment transferred its interest to Fleet Bank of Massachusetts and thence to Fleet National Bank. These assignments are not issues in respect to this appeal.

On August 21, 1992, the commissioner of banks of the Commonwealth of Massachusetts petitioned Attleboro into receivership and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver and liquidating agent of Attleboro. On the same date FDIC, desiring to avoid a lengthy liquidation process, entered into a purchase-and-assumption agreement with New Bedford. This agreement contained the following language:

"[T]he Assuming Bank [New Bedford] hereby purchases from the Receiver, and Receiver hereby sells, assigns, transfers, conveys and delivers to the Assuming Bank, all rights, title, and interest of the Receiver in and to all of the following: Loans, Liens, Credit Documents, remedies, claims, priorities, notes, loan agreements, etc., as more fully described therein."

The effect of this agreement was to transfer all assets from FDIC in its capacity as receiver to New Bedford. It is undisputed that the transfer took place. New Bedford assumed certain liabilities of Attleboro and in consideration thereof acquired its assets in a general transfer. Individual notes, including the notes that are the subject of this litigation, were not endorsed by Attleboro to the FDIC, nor did FDIC endorse the notes to New Bedford. Relying upon the lack of endorsement, Calcagni argues that New Bedford did not become a holder of the notes and certainly did not become a holder in due course. *See* G.L.1956 §§ 6A–3–202 and 6A–3–302. This assertion may well be true, but it is not controlling.

It is further undisputed that Calcagni defaulted on monthly payments due pursuant to the note for $134,500 and that this default constituted a violation of his obligation under the $85,500 note. In accordance with the terms of the promissory notes, on June 1, 1993, New Bedford, as transferee of the notes, accelerated the entire payments due thereunder and made demand upon Calcagni for payment in full. When Calcagni failed to make payment in accordance with the demand, New Bedford foreclosed on both mortgages and applied the proceeds from said foreclosures to the balance due on the notes.

After application of the proceeds of the sale, a deficiency in excess of $133,000 remained to be paid. This action was brought by New Bedford in order to collect that deficiency.

Calcagni has raised no defenses to the notes as against Attleboro. He simply argues that as a transferee New Bedford had no right to recover pursuant to the notes since it was neither a holder nor a holder in due course.

■ Section 6A–3–201 provides in pertinent part that

"(1) Transfer of an instrument vests in the transferee such rights as the transferor has therein, except that a transferee who has him or herself been a party to any fraud or illegality affecting the instrument or who as a prior holder had notice of a defense or claim against it cannot improve his or her position by taking from a later holder in due course.

"(2) A transfer of a security interest in an instrument vests the foregoing rights in the transferee to the extent of the interest transferred."

The effect of this section of the Uniform Commercial Code as adopted in Rhode Island is to give a transferee of a promissory note all the right that the transferor had to the proceeds thereof, but subject to any defenses which the maker of the note may have had against the transferor. In the case at bar no such defenses have been raised.

■ It is obvious that a holder who has taken the transfer of a negotiable instrument by endorsement has certain advantages. Included in those advantages is the presumption that the holder has good title to the instrument. The absence of the presumption in this case is of no consequence since New Bedford has proved without contradiction that it took title to these instruments as well as all other assets of the bank by virtue of a valid purchase-and-assumption agreement with FDIC. It is also advantageous to take title to an instrument by negotiation since such negotiation gives to a holder who takes for value the status of a holder in due course pursuant to § 6A–3–302. A holder in due course may recover on a promissory note without regard to a great number of defenses

that might otherwise be raised in respect to a transferee. No such defenses exist in the case at bar.

■ Consequently, under the Uniform Commercial Code as it has been interpreted in most jurisdictions, the transferee may assert such rights as could have been asserted by the transferor. *See Weast v. Arnold,* 299 Md. 540, 474 A.2d 904 (1984); *New Bedford Institution for Savings v. Gildroy,* 36 Mass. App.Ct. 647, 634 N.E.2d 920 (1994), and *Federal Deposit Insurance Corporation v. Russo,* 89 A.D.2d 575, 452 N.Y.S.2d 231 (1982). We interpret our statute as granting such rights to New Bedford. Further, it has long been settled law in Rhode Island that the assignee even of a nonnegotiable chose in action that has been assigned in writing may maintain an action thereon in his own name, but subject to all defenses and rights of counterclaim, recoupment, or setoff to which the defendant would have been entitled had the action been brought in the name of the assignor. G.L.1956 § 9–2–8. *See Lombardi v. Electromet Co.,* 540 A.2d 16 (R.I.1988); *United Master Plumbers Association of Rhode Island, Inc. v. Bookbinder Plumbing & Heating Co.,* 99 R.I. 683, 210 A.2d 573 (1965). Certainly the assignee of a negotiable instrument that has not been negotiated by endorsement should have no lesser right subject to all statutory and common-law defenses.

New Bedford also argues that it may be a holder in due course under federal common-law principles enunciated in *Gunter v.*

*Hutcheson,* 674 F.2d 862, 868–69 (11th Cir. 1982), and recognized by the Court of Appeals of the First Circuit in *In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1349–50 (1st Cir.1992). The First Circuit indicated in that case that the holder-in-due-course doctrine would apply in a purchase-and-assumption transaction such as that entered into by New Bedford in the case at bar. It is notable that in *Columbus* the court was dealing with a liquidation proceeding to which it would not apply the holder-in-due-course doctrine. *Columbus,* 968 F.2d at 1352.

It is unnecessary for this court to address the issue of a federal holder-in-due-course doctrine premised upon federal common-law principles since the law of the State of Rhode Island would suffice under the facts and in the circumstances of this case to support the judgment entered in the Superior Court.[2]

For the reasons stated, Calcagni's appeal is denied and dismissed. The judgment entered in the Superior Court is affirmed. The papers in the case may be remanded to the Superior Court.

FLANDERS, J., did not participate.

2. The concept of extending principles of "federal common law" to rights and liabilities relating to commercial law might well be debated in view of the sweeping language of Justice Brandeis in *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188, 1194 (1938):

"There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts."

We recognize that this language related to diversity cases, but when the federal courts depart from statutory construction relating to the Federal Deposit Insurance Corporation, 12 U.S.C. § 1823, and enunciate principles of common law applicable to commercial transactions within the

states, they may be sub silentio purporting to overrule the principles of *Erie Railroad Co. v. Tompkins.* Certainly the Supreme Court of the United States has recognized the existence of common law in circumstances where there was an overriding federal interest in the need for a uniform rule. *See, e.g., Illinois v. Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (dealing with the pollution of Lake Michigan bounded by four states); *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966); *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); *see also* Note, *Exceptions to Erie v.Tompkins: The Survival of Federal Common Law,* 59 Harv.L.Rev. 966 (1946). Does a circuit court of appeals have such power? This question, of course, would create a dilemma for state courts in determining what is the applicable supreme law of the land.