JOHNSON, Judge.
The plaintiff, Reilly-Benton Company, Inc., filed this civil action to collect the unpaid portion of the price of a construction subcontract with the defendant, Gur-tler, Hebert & Company, Inc., the prime contractor for the construction of an addition to the plant of Armstrong Tire & Rubber Company, at Natchez, Mississippi. The Civil District Court for the Parish of Orleans rendered judgment in favor of plaintiff. The defendant has appealed.
In the building to be constructed the general contract between the owner and the defendant requires the erection of major equipment called a “hot-dip” unit consisting of several large rectangular heaters, three tall towers about 90 feet in height and one shorter tower, and a network of ducts connecting the various component parts of the unit. The work scope of the prime contract included three main types of insulation in various parts of the equipment, briefly described, as follows: 1. “Blankets,” which are long strips of insulation, some of which are three inches and some four inches thick to be fastened to the sheet metal hot ducts with metal pins welded to the duct surface over which blankets there was to be applied one-half inch cement coating; 2. “Bats” and panels,” which were compressed insulation material prefabricated with sheet metal to encompass the heaters and towers; 3. “Loose wool” insulation to fill the joints and seams of the panels. Also there was insulation of the roof of the plant addition.
The plaintiff is an insulation specialist. The plaintiff asked to bid on insulation on this job and plaintiff’s Mr. Taylor and Mr. Watters met with defendant’s Mr. Black to discuss the matter. Mr. Black placed on the large conference table some 110 to 125 separate drawings and plans for the entire construction and installations. In examining some of the drawings at that time, Mr. Taylor and Mr. Watters noticed some reference to the various types of insulation and asked about them. Mr. Black explained that the only scope of work plaintiff was to bid on was the blanket insulation on the hot ducts and he advised plaintiff that the panel type insulation was to be prefabricated and installed with the sheet metal. Mr. Black selected and delivered to Mr. Taylor and Mr. Watters 12 separate drawings which he said would show all of the blanket insulation of the hot ducts which plaintiff was to bid on and plaintiff was not to be concerned with cold ducts, panel or bat applications. Nothing was said about the loose wool packing of the joints or seams of the panels.
Mr. Taylor and Mr. Watters took the 12 drawings with them and from them prepared plaintiff’s first proposal to do the blanket insulations, which they submitted on October 12, 1961, for the price of $14,-056.00. It so happens that plaintiff manufactures and sells various types of insulation and that the general contract requires the defendant to buy the insulation materi *516 al from C. A. Litzler Company, Inc.; that Litzler in turn placed its order with the plaintiff to purchase all of the insulation material called for by the general contract. This enabled plaintiff to make a profit in the sale of the materials to Litzler Company. Haying heard nothing from defendants in response to its first proposal, plaintiff decided to revise its proposal to defendant by reducing its price for the installation of the blanket insulation. On December 5, 1961, plaintiff submitted a second proposal for the same installation work contained in the first proposal but at a reduced price of $12,200.00. The pertinent portions of the proposal are as follows:
“We wish to thank you for the courtesies extended, and confirm our quotation verbally of this date for all labor, equipment, tools, scaffolding, supervision and accessory materials required to apply insulating materials furnished by C. A. Litzler on the above subject project in accordance with drawings by C. A. Litzler, Inc. Drawings pertaining to this work are as follows: Drawing No. EA 1953, 1952, 1924, 1923, 1920, 1916, 1907, 1900, 1899, and 1896; ER-519, and 517. It is understood under this proposal that blanket insulation and required insulating cement will be furnished to us at job site in storage free of cost to us.
“We are to furnish necessary weld pins, speed washers and equipment required to pin weld 12 gauge securement pins to the duct work as well as required lacing tie wire and/or staples. Insulation will be applied by impaling over se-curement welded pins and locked with speed washers impaled over the weld pins. Over this we will trowel approximately 1/2" of insulating cement in accordance with specifications noted on above drawings by manufacturer.
* *■ * * * *
“PRICE-Labor, equipment, scaffolding, supervision and accessores to apply insulation on hot ducts per above drawings complete-$12,-200.00” (Emphasis added).
It will be noted that this proposal is only for the installation of the blanket insulation on the hot ducts shown on the particular numbered 12 drawings which Mr. Black delivered to Mr. Taylor and Mr. Watters and that these 12 drawings do not show the application of the bats, panels, loose wool or roof insulation. It is also important to note that the book of specifications does not contain any description or requirements on the subject of insulation. Insulation is designated on the drawings. There are other drawings and documents which do outline the application of bats, panels, loose wool and roofing but Mr. Black limited plaintiff’s bid to the blanket insulation shown on the 12 drawings which he selected and which 12 drawings are designated by number in plaintiff’s proposal.
On December 12, 1961, the defendant prepared and sent to plaintiff the subcontract drawn on defendant’s own printed form, signed by Leonard B. Hebert, Jr., Executive Vice-President for Gurtler-He-bert Company, Inc. A cover letter, signed by Mr. Hebert, transmitting the subcontract, says:
“We transmit herewith Subcontract No. D-4282-3 in the amount of $12,200.-00 covering Insulation all as per your proposal and our acceptance thereof.”
Inserted in the printed form under the topic head: “Description of Work” by typewriter is the following stipulation:
“According to the contract plans and specifications the Armstrong Tire and Rubber Company is to furnish to Gur-tler, Hebert & Co., Inc., certain of the insulation materials. The materials which Armstrong Tire and Rubber Company furnishes us will be furnished to you free of cost, delivered in accordance with the terms and conditions of our contract. You are to take these materials and are to furnish whatever other materials required and perform with your labor and equipment all of the insu *517 lation work called for by the general contract, plans and specifications.”
Mr. Taylor, for the plaintiff, testified that upon the receipt of the subcontract he checked the scope of work by the drawings, which Mr. Black had furnished him, and his price, and finding them in agreement he signed the contract and returned the copies to defendant. After proceeding in the performance of the work, the defendant called upon plaintiff to do certain packing of loose wool in some joints; whereupon Mr. Taylor informed defendant that such work was not in plaintiff’s subcontract. They held a conference and on finding that this additional work, which defendant wanted plaintiff to do at that time, involved only $78.00, plaintiff agreed to do it rather than hold up the job. Later defendant called upon plaintiff to install the bats and pack the loose wool in the joints and seams, which plaintiff contended was not included in their subcontract and plaintiff refused to do that work. The defendant requested plaintiff to figure a price for this extra work. Plaintiff estimated that the work would cost about $2,-700.00 on a per day basis. The defendant called upon Armstrong Tire & Rubber Company, the owner, to allow that amount as an extra which defendant proposed to pay to plaintiff to do that additional work. The owner refused to allow the amount as an extra under the contract. The defendant then had the work done by common labor for the price of $1,997.14 and back-charged plaintiff in that amount. This suit was filed to collect the amount from the defendant.
The pleadings put the interpretation of the subcontract at issue. The plaintiff contends that the scope of its work is limited to the installation of the blanket insulation and cement coating and that if the language of the contract as written by defendant is to be construed to include all of the insulation of whatever kind and wherever located, then plaintiff contends that it signed the contract by mistake and error.
At the outset of the trial, counsel for defendant objected to any parol evidence on the question of the intent of the parties, contending that the parol evidence rule requires that the intent of the parties be determined only by the language used in the contract. This, of course, is the general rule applicable to written agreements.
There are exceptions which obviate the necessity of the strict application of the rule and permit resort to parol and other outside evidence. The trial court admitted the evidence subject to the objection with the announcement that it would rule on the objection at the end of the trial. After hearing all of the evidence, the trial court made the following ruling in writing:
“The Plaintiff claims that the following clause in the subcontract signed with the defendant does not express the true intent of the parties:
“ ‘ * * * you are to take these materials and are to furnish whatever other materials required and perform with your labor and equipment all of the insulation work called for by the general contract, plans and specifications’
“The Plaintiff further claims that it signed the subcontract through mistake.

“LAW

“Law of Evidence, McKelvey, Fourth Edition, p. 477, Evidence affecting the contents of Documents:

“ ‘The parol evidence rule has been so limited by the exceptions and qualifications which the Courts have recog-: nized that its value whether viewed as a rule of evidence or rule of substantive law may well be questioned.
“ ‘Ought a party to be bound by what he has committed to writing? Yes, if he did it voluntarily with a full understanding of what the writing meant and for a good present or promised consideration. No, if he did it *518 under the influence of * * *, or by mistake, * * * ’
“Selected Writings on EVIDENCE AND TRIAL, Association of American Law Schools. PAROLE EVIDENCE RULE— p. 79:
“Wigmore, Evidence § 2430 at 308:
‘“Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties thereto * * *. This intent must be sought where always intent must be sought (ante §§ 42, 1714, 1790), namely, in the conduct and language of the parties and the surrounding circumstances * * • *. There is a preliminary question for the judge to decide as to the intent of the parties, and upon this he hears evidence on both sides; his decision here, pro or con, concerns merely this question preliminary to the ruling of law.’
“The Court was impressed with the testimony of Mr. Taylor and Mr. Wat-ters.
“The objection to the admission of the parol evidence will be over-ruled.
“The evidence conclusively proves that the Parties did not intend for the Plaintiff to perform all of the insulation work called for by the general contract, plans and specifications. In fact, the Defendant did not call on the Plaintiff to perform all of the insulation work called for by the general contract.
“The Court is convinced that the Plaintiff signed the subcontract through mistake.”
In order to determine the correctness or incorrectness of this rule, we have the right and duty to read plaintiffs written proposal and defendant’s letter of transmittal of the subcontract, both referred to and quoted hereinabove, together with the scope of work as composed and written into the contract by defendant. When we do that, and after careful study of the applicable authorities, we are convinced beyond any question that there is clearly a glaring discrepancy in the language of plaintiff’s proposal of December 5, 1961, and defendant’s cover letter of December 12, 1961, transmitting this subcontract to plaintiff, on the one hand, and the language of the subcontract prepared by defendant describing the scope of work, on the other hand, which discrepancy creates an ambiguity which necessitates explanation. Plaintiff has specifically averred that its proposal and price does not include “all” insulation and that it signed the contract through error and mistake. The trial judge was fully warranted in applying one of the major exceptions to the general rule of evidence to ascertain the intent of the parties. The contract under consideration called for this plaintiff to install “all” the insulation of this project. In Snow-White Roofs, Inc. v. Boucher, La.App., 182 So.2d 846, the decision of this court was written by Judge Samuel, where the contract called for repairs to “Entire Roof Area” and pa-rol and collateral evidence was considered, citing Rosenthal v. Gauthier, 224 La. 341, 69 So.2d 367; Rudman v. Dupuis, 206 La. 1061, 20 So.2d 363; Holloway Gravel Co. v. McKowen, 200 La. 917, 9 So.2d 228. The Snow-White Roofs, Inc. v. Boucher, supra, case was cited in the case of Washington Aluminum Co. v. Pittman Construction Co., 5 Cir., 383 F.2d 798, which also cites the following cases on the subject: Capizzo v. Traders and General Insurance Company, La.App., 191 So.2d 183; Snow-White Roofs, Inc. v. Boucher, supra; Marcann Outdoor, Inc. v. Hargrove, infra; Collins v. Brunet, 239 La. 402, 118 So.2d 454; Cardos v. Cristadoro, 228 La. 975, 84 So.2d 606.
All the testimony in this case was given by Mr. Taylor and Mr. Watters for plaintiff and by Mr. Black and Mr. Hebert for the defendant. All the negotiations leading to this contract were between plaintiff’s witnesses and Mr. Black for defendant. Mr. Hebert did not get into this picture until after plaintiff submitted its first proposal and just before plaintiff submit *519 ted its second proposal, at which latter time Mr. Black had gone to another job. Mr. Hebert’s first connection with this plaintiff was the preparation of the subcontract. After Mr. Black left this job he had nothing more to do with it.
The witnesses for plaintiff testified that plaintiff specialized in the manufacture, sale and installation of all kinds of insulation and this plaintiff wanted to bid on as much of that work called for by the general contract and the plans and specifications as defendant would permit it to do and when Mr. Black, specifically limited Mr. Taylor and Mr. Watters to the application of blanket insulation on the hot ducts and selected and delivered to them the 12 drawings outlining that particular work, plaintiff’s proposal and price were likewise limited to the blanket insulation detailed on those drawings.
Mr. Black very frankly admitted that his conference with Mr. Taylor and Mr. Wat-ters was confined principally to the discussion of the blanket insulation and while he thinks they did discuss the “bats” they did not discuss the panels or the loose wool insulation and that the only kind of insulation to be applied on the hot ducts was the blankets. While Mr. Black did not deny that he selected the 12 drawings that outlined only the blanket insulation he said the 110 to 125 sheets of drawings were on the table and plaintiff being a specialist in insulation contracts, he assumed they would know loose wool would be used. He said the conference lasted only about an hour. We would believe that these men could not examine those detailed and intricate drawings and engage in the necessary discussion about the job in that short period of time and it seems reasonable that they would not have failed to take a much longer time to go through those 110 to 125 drawings if Mr. Black had not designated what drawings contained the information they needed. Mr. Black said all of the drawings were on the table and he did not remember handing any special ones to them. Mr. Black admitted that the book of specifications did not contain anything about insulation.
Mr. Hebert testified that while he was not present at the conference with Mr. Black and that when he drew the subcontract he thought and intended that plaintiff would do all the insulation. Mr. Hebert also wrote and signed the cover letter saying that the contract was in accordance with plaintiff’s proposal and defendant’s acceptance thereof. He said the letter meant to him to include all of the negotiations that went on before their offer to do this work was submitted. This is a very strained interpretation of that letter and we do not agree with it. The testimony is definite that the negotiations were confined to blanket insulation on the hot ducts and that plaintiff was instructed not to concern itself about any other kind of insulation, and in addition we are convinced that Mr. Black did select and deliver the 12 drawings that embodied only the blanket insulation.
What did the parties do to indicate their understanding and intentions with respect to this subcontract? One way to find the intention of the parties is to look to the manner in which it was executed. When it is said that we can look to the manner in which the contract is executed we are not confined exclusively to the manner in which the plaintiff performed the work required of it by the contract. We can also look to what the other party to the contract did with respect to the whole scope of insulation. The words of the contract used by defendant who prepared the contract have significance. For instance, when defendant used the words: “You are to perform all the insulation work called for by the general contract,” does the defendant mean for plaintiff to install the blankets and cement, all the bats *520 and panels, all the packing of the joints and seams with loose wool and all of the roofing insulation? In order to find out whether defendant has imposed all of these performances on this plaintiff we can look further to see what defendant has done in that regard. When we do that we find that the defendant has let the roofing insulation to another contractor; we find that defendant has said in writing that the contract which the defendant has drawn is in accordance with plaintiff’s proposal and defendant’s acceptance thereof; we find that defendant made a claim of the owner to allow the loose wool packing as an extra, and, equally as important, we find that the book of specifications have given no treatment to the subject of insulation whatever, and we find that the 12 drawings selected by defendant’s Mr. Black has indicated the only insulation on which plaintiff is to bid — the blanket application and cement covering, and we must then conclude that defendant’s words in the contract documents can mean only “all of the blanket insulation.” Godfrey v. United States Casualty Company, D.C., 167 F.Supp. 783; Elliott v. Dupuy, 242 La. 173, 135 So.2d 54; Simmons v. Hanson, 228 La. 440, 82 So.2d 757; Pendleton v. McFarlane, 222 La. 569, 63 So.2d 1; Hirsh v. Miller, La.App., 167 So.2d 539; Sigue v. Texas Gas Transmission Corporation, La.App., 154 So.2d 800; Marcann Outdoor, Inc. v. Hargrove, La.App., 140 So.2d 815; Smith v. Bell, La.App., 62 So.2d 513; McKenna v. Wallis, D.C., 200 F.Supp. 468 (see footnote 17 at 473); LSA-C.C. 1949, 1950, 1956.
The defendant in its answer reconvened for attorney’s fees under one of the provisions in the printed portion of the contract. The trial court dismissed the reconvention.
For these reasons, the judgment of the district court is affirmed with costs to be paid by defendant-appellant.
Affirmed.