269 So.2d 562 (1972)
WILSON WAREHOUSE COMPANY OF TEXAS, INC.
v.
MARYLAND CASUALTY COMPANY et al.
No. 9024.
Court of Appeal of Louisiana, First Circuit.
November 13, 1972.
*563 John S. White, Jr., Kennon, White & Odom, Baton Rouge, for Maryland cas. co.
David W. Robinson, Watson, Blanche, Wilson, & Posner, Baton Rouge, for Wilson Warehouse Co. of Texas, Inc.
Chapman L. Sanford, Kizer, Cangelosi, Sanford & Mosely, Baton Rouge, for Ward & Cangelosi.
Before LOTTINGER, ELLIS and PETERS, JJ.
ELLIS, Judge:
Plaintiff, Wilson Warehouse Company of Texas, Inc., brings this suit against defendant Maryland Casualty Company and others for amounts allegedly due it under a certain policy of insurance issued by Maryland to Wilson. After trial on the merits, judgment was rendered in favor of plaintiff and defendant Maryland has appealed. Plaintiff has also appealed, asking for penalties and attorney's fees in addition to the amount awarded below.
The trial court rendered written reasons for judgment which fully dispose of the issues here presented, and which we adopt as our own:
"This is an action by Wilson Warehouse Company of Texas, Inc., hereinafter referred to as Wilson, to recover from its insurer, Maryland Casualty Company, hereinafter referred to as Maryland, or from its insurance agent, Ward & Cangelosi, Inc., hereinafter referred to as Ward, or from its previous insurer, The American Insurance Company, hereinafter referred to as American, the sum of $80,170.39 together with statutory penalties and attorneys fees paid by Wilson as result of the wrongful death of its employee, Wilbur Gressett.
"Wilson and E. I. duPont de Nemours & Co., hereinafter referred to as du Pont, entered into a written agreement on June 1, 1964, concerning premises owned by Wilson *564 in Beaumont, Texas. (Plaintiff's Exhibit 1). On June 25, 1964, Wilson and du Pont entered into a supplemental agreement relative to the commencement of the prior agreement. (Plaintiff's Exhibit 2). When the above agreements were executed Wilson's liability insurer was American. The American policy was issued through American's agent, Ward. On December 1, 1964, American notified Ward that their agency contract was being cancelled and requested immediate cancellation of all its policies. As of December 1, 1964, and at all pertinent times thereafter, Ward was the agent of Maryland. Maryland through Ward issued a liability policy effective January 1, 1965, for a term of one year to Wilson, to replace the American policy.
"Wilbur C. Gressett, Wilson's employee, died on March 19, 1965, from inhalation of tetrachloride fumes emanating from du Pont's produce "Hypalon" stored on the subject premises pursuant to the June 1st agreement. Gressett's widow, individually, and as guardian of their three minor children, filed suit August 20, 1965, in the United States District Court for the Eastern District of Texas, Beaumont Division, to recover damages for the wrongful death of her husband. DuPont answered and filed third party proceedings against Wilson under the hold harmless clause of the June 1st agreement. The insurance policy issued through Ward by Maryland to Wilson was in full force and effect at this time. Wilson called on Maryland to defend the third party proceedings. Maryland refused contending that its policy did not afford coverage for this exposure. Thereafter, a tentative settlement was reached whose terms and the issue of Wilson's liability to du Pont were submitted to the Texas court. The court rendered judgment against du Pont and in favor of Mrs. Gressett and her children, approving the settlement of $50,000.00 and awarding Maryland (as Wilson's workmen's compensation carrier) $11,928.20 on its intervention and against Wilson and in favor of du Pont holding Wilson liable to du Pont under the June 1st agreement and awarding du Pont judgment over Wilson.
"Wilson brings this action primarily against Maryland to recover under its insurance contract and alternatively, against Ward contending that if Maryland's policy does not afford Wilson coverage then Ward breached its duty to Wilson in failing to obtain such coverage, and alternatively, against American on the basis that American mishandled Wilson's business during the transfer of insurance coverage from American to Maryland.
"The basic issue before the court is whether Maryland's insurance policy provides liability coverage to Wilson for the wrongful death of its employee. Maryland asserts two theories of non-coverage under its policy, as follows: (1) that the hold harmless clause of the June 1st agreement is a separate obligation from the remainder of the agreement and is not, in itself, a lease; therefore, there is no coverage under the policy because of the exclusion of the policy at page 2, Section IV(a); and (2) that if the liability asserted against Wilson by du Pont depends upon a construction of the entire agreement, then it is a warehouse agreement, not a lease, and there is no coverage because of the policy exclusions.
"This court finds Maryland's first contention without merit. The hold harmless clause is but one part of the entire agreement. The provisions of an agreement may be severable but the need for severability arises only where a portion of a contract is unenforceable or illegal. Courts sever the illegal and unenforceable provisions from the remainder of the contract rather than declare the entire contract void in order to avoid inequities. This situation does not exist here. The hold harmless clause was held valid and enforceable by judgment of the Texas court. Therefore, this court concludes that Maryland's liability under its insurance policy depends upon the classification of the entire Wilson du Pont agreement.
*565 "The parties hereto have stipulated that the Court should apply the law of Texas in interpreting the agreement between Wilson and du Pont.
"The basic rule to be ovserved in the construction of contracts is to ascertain and give effect, whenever possible, to the real intention of the parties, as that intention is revealed by the language used in the agreement. (13 Tex.Jur.2d Sec. 122). In ascertaining such intention it is a cardinal rule of construction that the instrument as a whole must be considered. (Whittington v. Cameron Compress Co., 268 S.W. 216 (Tex.App., 1925on rehearing); 13 Tex.Jur.2d Sec. 113). Where a contract as a whole discloses the intention of the parties, and certain words or clauses, if taken literally, would defeat such intention, it is the duty of the courts to construe them, if possible, in such manner as to be consistent with and to effectuate the general intent of the parties. (13 Tex.Jur. 2d Secs. 122, 123). Where possible a construction should be placed on the agreement that will give effect to all its provisions, so as to avoid the adoption of a construction that would render any provisions meaningless. (13 Tex.Jur.2d Sec. 113).
"A lease is defined as a contract by which one party, lessor, transfers to another, lessee, the right to possession, use and enjoyment of land, buildings, etc. for a definite period of time. (Webster's New World Dictionary, College Edition). The Texas Supreme Court defines a lease a grant of an estate in land for a limited term, with conditions attached. (Holcombe v. [Lorino] Sorino, 124 Tex. 446, 79 S.W.2d 307, 310 (1935). Texas courts have used two interconnected tests to determine whether a landlord-tenant relationship is created by a specific contract. First, determine the intent of the parties as revealed by their written contract. (35 Tex.Jur.2d, Landlord and Tenant, Sec. 21). Second, determine which party has the right of possession of the premises. (35 Tex.Jur.2d, Landlord and Tenant, Sec. 21).
"A. Intent of the parties.
"The cardinal principle in the construction of contracts is to give effect to the intent of the parties as expressed in their written contract. For example in Johnson v. Murray Co., 90 S.W.2d 920 (Tex.Civ.App.-Austin, 1936, writ dism'd), plaintiff in a suit for personal injuries contended that a landlord-tenant relationship was not created between the owner of a gin and its operator, the plaintiff's employer. In disposing of the contention, the court looked no further than the written agreement between the parties, stating as follows:
"`The contract expressly stated that it was a lease and used the term `lessors' and `lessees' to define the relationship of the parties. The language used in the contract is plain and unambiguous. The rental provided was for a definite sum, payable in a definite manner and at a definite time; the amount being measured by the number of bails of cotton ginned during the leased term." * * *
"The language of the contract is plain and unambiguous, and is a lease creating the relation of landlord and tenant between the parties. The relation of landlord and tenant is established where the owner of the land or tenement for compensation, `consents to the occupancy thereof by another and the latter holds in recognition or insubordination to the title of the former'." (at page 923).'
"The case of Durrett & Co. v. Iley, 434 S.W.2d 367 (Tex.Civ.App., Dallas, 1968, writ refused) illustrates the controlling effect of particular words used by parties to describe their relationship. In Durrett the parties entered into an agreement which was entitled "Sand Pit and Gravel Lease Agreement." The agreement generally described the land involved and stated that a royalty would be paid on the dirt and gravel removed. There were no specific agreements regarding which party was to have possession of the premises; the duration of the agreement, or other provisions *566 which might normally be found in a lease. The party removing the sand and gravel under the agreement contended that it was a grant of the minerals rather than an ordinary lease. The court concluded that the instrument was a lease, pointing specifically to the general rule of law that words and phrases used in a contract will be accorded their ordinary, popular and commonly accepted meaning. The court pointed to the fact that the term "lease agreement" was an expression which dominated the instrument, and that this would be understood by an ordinary person to mean a contract by which one party gives to another the use and possession of lands, buildings, etc. The court held that the instrument "in light of the common and ordinarily accepted meaning of the dominant terms used therein created a lease agreement rather than a conveyance."
"Based on these general rules, the parties to the present agreement intended a lease, and expressed their intent in clear and unambiguous terms. For example, in the June 1st agreement the parties state that Wilson is constructing an addition to its warehouse and that du Pont has agreed to "lease" those facilities. (Page 1, paragraph 3). In paragraph 2 the parties refer to 8,000 square feet of storage space previously "leased" to du Pont under the January 13, 1961 agreement. In the June 24th agreement the parties described themselves as "lessor" and "lessee", and used the term "lease" to describe their agreements. In addition, the storage facilities are described as "leased premises". From these examples, it can be seen that the dominant term used by the parties in the various instruments is "lease" and the ordinary and usual meaning of this term was obviously intended by the parties.
"The intention of the parties is also shown by the other terms and conditions of the agreements. Paragraphs 5 and 11 of the June 1st agreement provide that du Pont can place any type of product it desires in the area leased from Wilson. Paragraph 18 provides that du Pont can require Wilson, against Wilson's wishes, to rebuild or repair the facilities in case of damage by natural forces if the work could be completed within 6 months, which is a common provision in lease agreements. Paragraph 19 provides for termination of the agreement upon bankruptcy, receivership or trusteeship of Wilson, which is a common provision in leases. Paragraph 22 clearly shows a lease by referring to du Pont's taking "possession" of the premises when they were completed. Paragraph 23 in conjunction with paragraph 12 provides for du Pont to pay Wilson a sum equal to ½ the minimum monthly storage charge for the remainder of the unexpired 3 year term of the agreement should du Pont's product lines, product requirements or own warehouse facilities change. It should be remembered in connection with these provisions of the agreement that in ascertaining the intention of the parties the instrument as a whole must be considered and where a contract as a whole discloses the intention of the parties, and certain words or clauses would defeat such intention if taken literally, it is the duty of the courts to construe them in such manner as to be consistent with and to effectuate the general intent of the parties. (13 Tex. Jur.2d Secs. 113, 122, 123). Where possible a construction should be placed on the agreement that will give effect to all its provisions, so as to avoid the adoption of a construction that would render any provisions meaningless (13 Tex.Jur.2d Sec. 113). As illustrated above, the language of the parties and the agreement provisions show that the parties intended a landlordtenant relationship.
"B. Right of possession.
"Additionally, Texas courts determine which party has the right of use and possession of the premises. For example, in Brown v. Johnson, 118 Tex. 143, 12 S.W.2d 543, 545, the court stated, as follows:
"`A casual reading of our landlord and tenant law demonstrates that one of the essentials of a valid leasing of premises *567 whereby the relation of landlord and tenant is established, is that exclusive possession of the premises rightfully belonging to one party is transferred to another, and thus the relation of landlord and tenant is established.'
"The term "exclusive possession" does not mean absolute control and dominion or actual physical possession of the premises. It is well established that the parties by their contract can limit or restrict the uses of the premises or attach conditions for its enjoyment. (35 Tex.Jur. 2d, Landlord and Tenant, Sec. 55). Nor does the tenant have to actually exercise his control and dominion over the premises. For example, in Weil v. Ann Lewis Shops, 281 S.W.2d 651 (Tex.Civ.App., San Antonio, 1955, writ ref.), the courts upheld a lease although the tenant never used or occupied the premises. In the final analysis, the lease arrangement is controlled by whether or not the lessee has the "right" to possession, as opposed to the mere right to use the premises, and could bring a legal action to enforce that right of possession, Mallan v. Trans-Texas Airways, 227 S.W. 2d 344 (Tex.Civ.App., El Paso, 1949).
"Tested by these principles a landlord tenant relationship existed between Wilson and du Pont. The premises were specifically constructed for du Pont according to du Pont's specifications. The exact area and dimension of the storage facilities were described and designated. Du Pont controlled shipment of products into and out of the facilities. Du Pont could place any product in the area. In the event of destruction of the premises, du Pont could require Wilson, against Wilson's desire, to rebuild or repair the facilities, if done in six months. A definite minimum rental was provided for the facility. A definite 3 years term was established. From these factors, it is clear that du Pont had the right to possess the premises and could have judicially enforced that right. Undoubtedly Wilson had contractual obligations to handle storage, shipments and do the work for du Pont on and about the premises. Wilson was paid additional compensation for these services.
"The strongest indication of which party had the right of possession of the premises is found in Paragraph 22 of the June 1st agreement and in the June 24th agreement. Paragraph 22 provides that this agreement is not effective until the possession of the premises is relinquished to du Pont. Wilson relinquished its right of possession to du Pont of the facilities in the June 24th agreement which provides that du Pont shall "take possession of the leased premises" on June 25, 1964. Thus the relation of landlord and tenant was established by the Wilson-du Pont agreement.
"Maryland cited the cases of Luther Transfer & Storage v. Walton, [156 Tex. 492] 296 S.W.2d 750 (1956) (rehearing denied, 1957) and Curtiss Aeroplane & Motor Corporation v. Haymakers Warehousing Corporation, [Tex.Civ.App.] 264 S.W. 326 (1924) in support of its position. Both cases are factually distinguishable. There are a number of important points of distinction between the arrangements in the Luther case and the contract between Wilson and du Pont. First, there was no written agreement between Luther and Walton. Second, there was no manifestation of the intent of the parties as to the nature of their agreement with each other as opposed to the manifest intention of the parties here that their agreement be considered a lease of premises. Third, in deciding the issue, the court noted at page 753 that `There was no real dispute between the parties about the facts of the relationship between them. Fourth, the duration of the agreement was only from month to month as opposed to the definite 3 year term here.'
"In Curtiss, Haymakers Warehousing Corporation was a subsidiary of the Texas Hay Association organized solely for the purpose of storing and warehousing hay owned by the Texas Hay Association and in order that it might issue its warehouse receipts to the Texas Hay Association to borrow money on the receipts. Both had the same stockholders and the same general *568 manager. The Haymakers Warehousing Corporation was engaged exclusively in acting as warehouseman for the Texas Hay Association. Further, Curtiss arose in the context of Haymakers Warehousing Corporation trying to recover damages from the hold-over tenant Curtiss.
"For the above reasons, the Court holds that the Wilson-du Pont agreement is a lease and that the Maryland insurance policy affords coverage to Wilson under the terms of its insurance policy. It is unnecessary to decide Wilson's alternative claims against Ward and American.
"Judgment will be rendered in favor of plaintiff and against the Maryland Casualty Company for $80,170.39.
"No award is made for penalties and attorney's fees because there was a most serious legal issue, i. e., interpretation of the agreement, presented in this case. This is the reason Maryland denied coverage and the Court feels that it was in good faith in so doing."
The judgment appealed from is affirmed, at defendants' cost.
Affirmed.