301 So.2d 676 (1974)
STARKE TAYLOR & SONS, INC., Plaintiff and Appellant,
v.
RIVERSIDE PLANTATION et al., Defendants and Appellees.
No. 4679.
Court of Appeal of Louisiana, Third Circuit.
October 16, 1974.
*677 Whitehead & McCoy, by Kenneth D. McCoy, Jr., Natchitoches, for plaintiff-appellant.
Gerard F. Thomas, Jr., Natchitoches, for defendants-appellees.
Before HOOD, CULPEPPER and DOMENGEAUX, JJ.
CULPEPPER, Judge.
This is a suit for breach of contract. The plaintiff, Starke Taylor & Son, Inc., entered into a contract to purchase the 1971-72 cotton crop from two certain farms operated by the defendant, Riverside Plantation, a partnership composed of John T. Batten and Mrs. Desiree Clotier Prudhomme. Plaintiff contends defendant was obligated to deliver the entire 569 bales produced from the two farms during the 1971-72 crop year, and that defendant delivered only 209 bales. Plaintiff seeks damages in the sum of $19,978.47 for the undelivered bales.
Defendants contend the entire contract is invalid because of a misunderstanding by the parties as to the meaning of the term "December 7 cut-off". Defendant Batten, manager of Riverside Plantation, says he understood this term to mean that the contract terminated on December 7, 1971, and that he was not obligated to deliver to plaintiff any cotton ginned after that date. Plaintiff contends the term "December 7 cut-off" is in the pricing paragraph of the contract and designates only the date on which prices changed to a lower figure.
The district judge found the contract ambiguous and permitted parol testimony to determine the intention of the parties. He concluded both parties intended the contract to be effective until December 7, *678 1971, and hence the contract is enforceable to that date. As a consequence, he awarded plaintiff judgment for $10,089.02 as damages for defendants' failure to deliver 186 bales picked and ginned before December 7, 1971, but not delivered to plaintiff. Plaintiff appealed, seeking additional damages for the bales ginned after December 7, 1971. Defendants also appealed, contending the entire contract is void for lack of a meeting of the minds as to the meaning of the disputed term "December 7, cut-off".
The general facts are that during the early part of 1971 several cotton farmers in Natchitoches Parish joined together and endeavored to find a purchaser for their 1971-72 crops. The idea was that a buyer would pay a higher price for all of the cotton from a large block of acreage. One of the farmers, Mr. Al Prudhomme, contacted J. R. Brett, a cotton broker in Harlingen, Texas. Brett in turn contacted the plaintiff, Starke Taylor & Son, Inc., of Dallas, Texas, and secured from them an offer. This offer was conveyed to Prudhomme and eventually agreed to by defendant and several other farmers.
Since Prudhomme had some previous experience in buying cotton and handling the necessary papers, Brett engaged Prudhomme to handle the contracts for one-half of the broker's commission, which was $1 per bale. Prudhomme used contract forms which he had previously obtained from Brett. He filled in the spaces in conformance with instructions from Brett and what Prudhomme understood the sellers had orally agreed.
The particular contract signed by the defendant, Riverside Plantation, is dated April 24, 1971, and reads in pertinent part as follows:

"COTTON SALES CONTRACT 1971-72 CROP YEAR
"The undersigned hereby agrees to sell and deliver to Starke Taylor & Co., Dallas, Texas, or his agent, (hereinafter referred to as PURCHASER) and PURCHASER agrees to buy SELLER'S entire production of cotton which shall be produced, gathered, and ginned from the following cotton acreage in the following counties, Natchitoches, La., during the 1971-72 cotton harvesting period.

 FARM SERIAL NO. OF ACRES
 PLANTED TO COTTON
I-8510 300 a
I-6509 60 a
 ______
 360 a total

"The purchase price shall be as follows:

25¢ per lb. H/R for 3.4 to 5.0 mike
24¢ per lb. H/R for 3.0 to 3.3 and
 5.1 and higher
24¢ for 3.0 and Better, Reduced in
 Grade
360 over loan for 2.0 & below and cotton
 ginned after Dec. 7, 1971
Dec. 7 Cut off
B. G.'s - 19¢

". . . .
"Delivery of all cotton shall be made to the PURCHASER promptly upon receipt by SELLER of government green classing cards and the warehouse receipts, and this contract shall be considered fulfilled when the Seller delivers all cotton produced and ginned on the above farm or farms in the 1971/72 harvesting season."
At the time the contract was executed, the market price of cotton was about 3¢ per pound less than that provided in the agreement. However, in the fall of 1971 and early 1972, the market price of cotton rose dramatically to 35¢ per pound and more.
Unusually wet weather in Natchitoches Parish delayed the harvesting of cotton in the fall of 1971. By December 7, 1971, Riverside had ginned 395 bales. Of these, it delivered 209 bales to plaintiff and received payment according to the contract. After December 7, 1971, Riverside ginned an additional 174 bales, none of which was delivered to plaintiff.
*679 As stated above, it is plaintiff's contention that the contract as written must be interpreted to mean that it purchased the entire cotton crop produced and ginned by defendant from the two farms during the 1971-72 season. Plaintiff emphasizes the language in the first paragraph of the contract which states that defendant agrees to sell and plaintiff agrees to buy "seller's entire production of cotton which shall be produced, gathered, and ginned from the following cotton acreage ... during the 1971-72 cotton harvesting period." Also, it is stated in the fourth paragraph of the agreement, as quoted above, that "this contract shall be considered fulfilled when the seller delivers all cotton produced and ginned on the above farm or farms in the 1971-72 harvesting season."
On the other hand, defendant emphasizes the term "December 7 cut-off", which appears in the portion of the contract having to do with price, as quoted above. Defendant argues that "December 7 cut-off" means that the contract terminated on December 7, 1971, and after that date he was not obligated to deliver any more cotton. He says that "December 7 cut-off" could not have reference to the date on which the price changed, because that is covered by the immediately preceding provision in the contract which states "350 over loan for 2.9 and below and cotton ginned after December 7, 1971". The argument is that if "December 7 cut-off" has to do only with the date on which the price changed, then that provision was placed in the contract twice and is a superfluous duplication which it is not logical the parties intended.
We conclude the contract is ambiguous on its face. As written, it is susceptible of the interpretation that December 7, 1971 was the date on which the price changed to 350 over loan, etc. On the other hand, since under this construction the "December 7 cut-off" would be a mere duplication, it is logical that a party reading the agreement could construe it to mean that December 7 was the date on which the contract terminated.
LSA-C.C. Article 1945 provides that legal agreements have the effect of law upon the parties, that courts are bound to give legal effect to contracts according to the true intent of the parties, and that the intent is to be determined by the words of the contract, when these are clear and explicit. However, if the language of a written agreement is on its face ambiguous, the courts can consider parol evidence and all of the surrounding circumstances in an effort to determine the true intent of the parties, Capizzo v. Traders & General Insurance Company, 191 So.2d 183 (La.App.3d Cir. 1966); Gulf Refining Company v. Garrett, 209 La. 674, 25 So.2d 329 (1946); Reilly-Benton Company v. Gurtler Hebert & Company, 212 So.2d 514 (La.App.4th Cir. 1968).
The parol evidence shows that "cut-off dates" are used in cotton purchasing agreements and that they have different meanings depending upon the context in which they are used. Mr. Brett, an experienced cotton broker, testified that in some contracts a cut-off date is provided on which the price changes. He explained that normally the grade of cotton, i.e., the color and amount of trash, deteriorates as the picking season progresses and the buyer may want to provide a "cut-off date" upon which he would pay a less price for this late low-grade cotton. Mr. Brett also testified that some contracts provide a cut-off date which terminates all obligations to sell or purchase cotton. However, Brett stated that if the cut-off date is intended to terminate the contract, express language is usually added to make this clear.
Mr. Ed Prudhomme, who procured the contract forms from Brett and filled in the blanks as per Brett's instructions, testified that he personally had never seen a "cut-off date" in a contract before this occasion. Prudhomme says that when the contract at issue was signed, he and Mr. Batten discussed the "December 7 cut-off" provision, but he did not recall what was said. Prudhomme's own cotton contract for that year had a similar cut-off date *680 provision, but he did not construe it as terminating the contract. Prudhomme sold his entire 1971-72 crop under the contract.
Mr. Brett was of the opinion that in the present contract the December 7 cut-off date had reference only to price, and that it did not terminate the contract.
Mr. Batten testified that when he signed the contract he discussed the "December 7 cut-off" provision with Mr. Prudhomme, and from this discussion received the understanding that December 7 was the date of termination of the contract. It was Batten's understanding that after December 7 he was not required to deliver any more cotton, nor was the purchaser required to accept it.
Mr. Peter Cloutier, Mr. James Stacy and Mr. Richard Williamson, other farmers who signed similar contracts that year, testified for defendant that they construed the term "December 7 cut-off" to mean that the contract terminated as of that date.
The trial judge, who saw and heard the witnesses, concluded defendant reasonably intended and believed that the contract terminated on December 7, 1971, and defendant had no obligation to deliver cotton ginned after that date. He concluded there was no agreement of the parties that the contract be effective beyond that date, and hence the agreement terminated on December 7, 1971. We find no manifest error in these conclusions.
As to defendant's argument that the lack of an agreement between the parties as to the meaning of the "December 7 cut-off" causes the entire contract to be void, the district judge is clearly correct in holding that the invalidity of that portion of the contract does not render void the obligation of plaintiff to buy and defendant to sell all cotton produced and ginned up to that date. Both plaintiff and defendant intended the contract to be effective until December 7, 1971. Where the enforceable provisions of a contract can be severed from the unenforceable provisions, the courts should, in order to avoid inequities, sever the enforceable from the unenforceable portions, rather than declare the entire contract void, Wilson Warehouse Company of Texas, Inc. v. Maryland Casualty Company, 269 So.2d 562 (La.App.1st Cir. 1972); Glaze v. Duson, 4 So. 861 (La.1888); Labatt v. Louisiana Adjustment Bureau, Inc., 185 So. 702 (Orl.La.App.1939).
Defendant also argues that plaintiff's suit should be dismissed because it did not put defendant in default by making a formal demand for the delivery of the remainder of the cotton. However, the evidence shows that plaintiff knew defendant had violated the contract by selling a large portion of the cotton crop to other parties. Also, plaintiff had been in contact with Mr. Al Prudhomme and it is reasonable to conclude it knew defendant had no intention to deliver any more cotton. The evidence shows that plaintiff's understanding was correct, i.e., that Mr. Batten had decided that he would not deliver cotton ginned after December 7. Actually, Batten sold the cotton to other parties long before this suit was filed. Under the circumstances, a formal demand would have been a vain and useless thing and was not necessary, Penick & Ford v. Waguespack & Haydel, 148 La. 39, 86 So. 605 (1920).
Defendant also argues that the measure of damages used by the trial judge is questionable. As to the 186 bales produced and ginned by defendant prior to December 7, 1971, but not delivered to plaintiff, the court found the defendant realized an average profit of 10.83¢ per pound over the 25¢ that he agreed to accept from plaintiff. The judge multiplied the number of pounds by 10.83¢ and arrived at damages in the sum of $10,089.02. Defendant argues that since plaintiff is a large cotton buyer it could probably have purchased cotton for a lesser figure at certain times and mitigated its damages. We find the measure of damages used by the district judge was reasonable and logical.
*681 For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed to plaintiff and defendant in the proportion of one-half to each.
Affirmed.