[Sac. No. 6821. In Bank. Dec. 27, 1957.]

WALTER WEBB et al., Plaintiffs and Respondents, v. STANDARD OIL COMPANY OF CALIFORNIA (a Corporation) et al., Appellants; HARTFORD INSURANCE COMPANY (a Corporation) et al., Cross-Complainants and Respondents.

Cooney & Littlejohn, Devlin, Diepenbrock & Wulff, J. J. Diepenbrock and Pillsbury, Madison & Sutro for Appellants.

Stanley J. Gale and Richard Patton for Plaintiffs and Respondents.

Augustus Castro, Cooley, Crowley, Gaither, Godward, Castro & Huddleson and Nicholas Zoller for Cross-Complainants and Respondents.

GIBSON, C. J.—Mr. and Mrs. Webb brought this action to recover for damages sustained when their house was destroyed by a fire allegedly caused by the negligence of defendant Standard Oil Company and its agent, Floyd Wimberly, in installing propane gas cylinders. Two insurance companies, each of which had paid plaintiffs $5,000 in accordance with the terms of fire insurance policies upon the real property destroyed, were joined as parties defendant, and they cross-complained against Standard and Wimberly. Judgment, rendered by the court sitting without a jury, was in favor of plaintiffs in the amount of $30,000 and in favor of the insurance companies in the amount of $5,000 each. Standard and Wimberly appeal, claiming that the evidence is insufficient to support the judgment and that the court erred in failing to order plaintiffs to produce copies of their state and federal income tax returns.

The fire started in a completely enclosed washroom, 9 feet long, which adjoined the kitchen. A gas refrigerator had been set in the wall between the kitchen and the washroom so that its door opened into the kitchen, and the back of the refrigerator extended through the wall into the wash-

room. The apparatus required to operate the refrigerator was located in the washroom and included a cabinet containing two cylinders, a pressure-reducing device called a regulator, and some tubing. An open burner in the refrigerator about 9 inches from the floor constituted a source of ignition for escaping gas.

Sometime between 6 and 8 o'clock on the evening before the fire, Wimberly delivered two Flamo cylinders of propane gas owned by Standard, connected them with the refrigerator, and turned on the gas. The refrigerator had not been in use during the preceding year, and Mrs. Webb asked Wimberly to check the unit for leakage and told him that when the refrigerator had previously been in use, she could smell escaping gas. She suggested tht he use soap to test the installation, but he said that he did not think this was necessary and instead passed three or four burning matches around the connections. He cleaned the burner of the refrigerator, tested its "lock up" pressure, and lit the gas. Before Wimberly left, Mrs. Webb asked him to "be sure to check everything again." He opened the refrigerator door, looked inside and told her that everything was "O.K." Flamo cylinders are equipped with "soft plugs" which may leak if damaged in handling, but Wimberly did not test these plugs nor did he test the valves or regulator after he lit the burner.

Mrs. Webb, who was alone on the premises, did not reenter the washroom after Wimberly left. She was awakened by a noise about 1:30 or 2:00 a. m. and went to the kitchen where she found that part of the wall between the kitchen and washroom had burned away, and she could see that there was a fire inside the washroom. The house was completely destroyed before help arrived.

A manual containing regulations promulgated by Standard, which Wimberly testified were good, sound safety practices, was introduced into evidence. These regulations required that tests to discover leakage of Flamo gas should be made with soap and not with matches and that under no circumstances should Flamo cylinders be installed in the interior of buildings. (Marketing Operating Manual, Standard Oil Company of California (1950).) There was testimony that the testing for leaks should have been made after the burner was lit and after the air in the lines had been bled off through the burner, and that a leak which a flame test would not disclose could be detected by a soap test. Propane gas is heavier than air and will settle as it escapes from a cylinder,

and there was evidence that a small amount of gas in the air is sufficient to create an explosive mixture.

The court found that defendants were negligent in installing, testing and connecting the Flamo cylinders and that the negligence of defendants was the direct and proximate cause of the fire. The evidence is clearly sufficient to support these findings.

The principal question presented on this appeal is whether the court erred in refusing to order plaintiffs to produce copies of their state and federal income tax returns for the year of the fire. At the time defendants demanded the production of the returns they admitted that they did not know what the returns contained but asserted that they were entitled to inquire whether plaintiffs had made any claims for deductions because of property loss from the fire. They argued that such deductions might impeach plaintiffs' testimony and constitute admissions tending to show that plaintiffs' valuation figures were too high. We shall assume, for purposes of discussion, that such returns were admissible if not privileged.

Section 19282 of the Revenue and Taxation Code provides: "Except as otherwise provided in this article, it is a misdemeanor for the Franchise Tax Board, any deputy, agent, clerk, or other officer or employee, to disclose in any manner information as to the amount of income or any particulars set forth or disclosed in any report or return required under this part." Section 19283 provides: "Such information may be disclosed in accordance with proper judicial order in cases or actions instituted for the enforcement of this part or for the prosecution of violations of this part." The remaining provisions of this article which permit disclosure are limited to specific situations, none of which appears here.*

The wording of the quoted sections discloses an intent to preserve the secrecy of the returns except in the few situations which are expressly noted. The same intent is

---

*Under section 19284 of the Revenue and Taxation Code, information may be furnished on request to a legislative committee, but further disclosure, except to law enforcement officers in connection with income tax violations, is made a misdemeanor. Section 19285 permits the attorney general to inspect the return of a taxpayer who brings an action to set aside or review the tax based thereon. Under sections 19286 and 19287 officials of other states and of the United States may be allowed to inspect or be given information regarding the returns in cases where reciprocal statutes grant substantially similar privileges, but any unwarranted disclosure of such information is a misdemeanor. Section 19288 permits a charge to be made for furnishing abstracts, and section 19289, the concluding section of this article, permits the publication of statistics when so classified as to prevent the identification of particular returns.

shown by the statutory history. When the statute was originally adopted no restriction was placed on the issuance of court orders permitting disclosure of information. (Personal Income Tax Act of 1935, Stats. 1935, pp. 1090, 1122.) The statute as it now reads limits the authorization for such orders to cases involving tax enforcement or the prosecution of violations.

A similar situation was presented in *Leave* v. *Boston Elevated Ry. Co.*, 306 Mass. 391 [28 N.E.2d 483, 487 et seq.], where the income tax law originally prohibited disclosure of information regarding tax returns except in proceedings to collect the tax "or by proper judicial order," and a subsequent amendment eliminated the quoted clause. It was held that the amendment of the statute was intended to change the rule governing the admissibility of tax returns, that the provisions of the statute ought not to be circumvented by any indirect attack, and that the plaintiff could not be compelled to produce a copy of his return.

The purpose of the amended statutory provisions prohibiting disclosure is to facilitate tax enforcement by encouraging a taxpayer to make full and truthful declarations in his return, without fear that his statements will be revealed or used against him for other purposes. If the information can be secured by forcing the taxpayer to produce a copy of his return, the primary legislative purpose of the secrecy provisions will be defeated. The effect of the statutory prohibition is to render the returns privileged, and the privilege should not be nullified by permitting third parties to obtain the information by adopting the indirect procedure of demanding copies of the tax returns.

The case of *Samish* v. *Superior Court*, 28 Cal.App.2d 685, 693 et seq. [83 P.2d 305], is clearly distinguishable since it was decided under the Personal Income Tax Act of 1935 as it existed prior to the amendment discussed above.

At the time of the fire, both the state and federal income tax legislation permitted deductions for the loss of property destroyed by fire and not compensated for by insurance or otherwise, and it may be assumed that the respective returns of a taxpayer for the same period will contain substantially the same information. Under the circumstances, forcing disclosure of the information in the federal tax return would be equivalent to forcing disclosure of the state

returns and would operate to defeat the purposes of the state statute. It follows that the trial court did not err in refusing to require production of copies of either the state or federal tax returns.

The judgment is affirmed.

Carter, J., Traynor, J., Schauer, J., Spence, J., McComb, J., and Bray, J. pro tem.,* concurred.

Appellants' petition for a rehearing was denied January 23, 1958. Bray, J. pro tem.,* participated therein in place of Shenk, J.

_____

*Assigned by Chairman of Judicial Council.