**Henry E. DAVIS, et al., Plaintiffs,**

**v.**

**Robert LEAL, et al., Defendants.**

**No. CIV.S–97–2432 DFL GGH.**

United States District Court,
E.D. California.

Feb. 18, 1999.

---

Joseph E. Maloney, U.S. Atty., Sacramento, CA, for Henry E. Davis.

John M. Brown, Mullin Hoard and Brown, Amarillo, TX, for Federal Deposit Ins. Corp.

Jared G. Carter, Rawles Hinkle Carter Behnke and Oglesby, Ukiah, CA, for Jack L. Cox, Raynette Cox.

Stanley A. Coolidge, Jr., Law Offices of Stanley A. Coolidge, Yuba City, CA, for Robert Leal.

### ORDER

HOLLOWS, United States Magistrate Judge.

*Introduction*

Plaintiffs, Davis and F.D.I.C. (Federal Deposit Insurance Corporation) seek to compel from defendant Leal voluminous discovery including tax return information and general business records. Much of the outcome of the motion will depend on whose privilege law is applied-federal or state. To arrive at the proper determination, it is necessary to understand the nature of the claims brought, the law that will supply the "rule of decision" on the merits, and choice of law determination in actions where the F.D.I.C. is a party.

*Background Facts*

The complaint has survived a motion to dismiss; therefore, the truth of the factual assertions are accepted for purposes of this discovery motion.[1]

Defendant Leal was in the business of managing large tracts of undeveloped real estate, and one of these tracts involved Barbican Farms, owner of a 642 acre tract in Yuba County. Thomas Nevis, who had previously been associated in business deals with Leal, approached Leal and informed him that he had located prospective buyers (the Smith Group) for the Barbican Farms property. In a transaction, the precise details of which need not be discussed here,[2] Leal made a deal with Barbican Farms to purchase the property himself (through Goshute Corp, a nominee and alter ego of Nevis) for $4,750,000 so that Leal could then sell the property to the Smith Group for $8,444,800. Although Leal never appeared in the chain of title, Leal ultimately had the Smith Group note and deed of trust assigned to the Leal Family Trust ("Leal") as payee on the Smith note (hereafter the "Leal Note"). In brief, after a "wash" downpayment scenario, Leal held a note of much greater value than the note held by Barbican Farms.

Leal promised Nevis a "finder's fee" in the amount of $750,000.00 for Nevis supplying the Smith Group buyers, and for Nevis' help in structuring the transactions. The finder's fee was to be split-one half to a principal of the Smith Group, and one half to Nevis, structured as a benefit to Nevis' son Richard. Leal then signed the finder's fee agreement with Richard concerning the one-half of the finder's fee which contained a "foreclosure provision." "If payments are not made on the All Inclusive Note [Smith Group Note], then Leal will not be obligated to pay Nevis per the terms of this Agreement. Likewise should the All Inclusive Note be foreclosed upon, then this Agreement shall become null and void." The finder's fee was supposed to be totally paid by August 1, 1993. On May 7, 1993, the provision for total payment by August 1993 was deleted by mutual, written modification.[3]

Soon after the initial transactions were completed, the Smith Group indicated that it could not meet its obligations under the note that had been assigned to Leal. Smith Group thereupon conveyed its interest in Barbican Farms to KCO Nordic Land Partners. After making some initial payments on the Leal Note, Nordic also became unable to fulfill its obligations, and in an agreement made on the same date as the finder's fee modification, May 7, 1993, KCO was given more time to make good its financial promises. Nevertheless, KCO soon again found itself unable to meet its obligations, and Leal initiated foreclosure action.

In order to forestall foreclosure, Leal then structured an arrangement with the principal partner of KCO (Karlshoej) to further extend the due dates on the Leal Note. The finder's fee agreement was modified a second time. Nevis, through his son Richard, (and Cox) agreed:

1. This does not mean, however, that the court is bound to accept erroneous or exaggerated legal theories that stem from the stated claims, and then is required to grant discovery which corresponds to the erroneous or exaggerated theories. As will be seen, a good bit of the contested discovery hinges on the proper legal interpretation of the claims set forth in the complaint. While for discovery purposes, this court should accept any colorable interpretation of the claims, total acquiescence by the court in a party's erroneous legal theories will result in discovery abuse.

2. The court sees no need to describe all the parties and entities, and define all the transactions involved in the purchase/sale of Barbican Farms; the court will describe the transactions in their practical effect. Suffice it to say that the complaint paints a financially incestuous relationship among buyers and sellers and future buyers and sellers.

3. The Nevis finder's fee was purportedly assigned to plaintiff Cox in January 1994. Cox claims a right in the unpaid finder's fee in this litigation. However, Cox is not involved in this discovery motion, and his precise situation is unimportant to the outcome herein.

This will also confirm the agreement of the parties that a transfer or conveyance of said Note, in whole or in part, shall not accelerate the payment obligation (finder's fee) and in the event of foreclosure of the Deed of Trust as a result of default ... there shall be no obligation whatsoever to pay the finder's fee.

Plaintiffs assert that Leal represented to Nevis and Cox that the non-acceleration clause was needed in order to allow Leal some flexibility in utilizing the Leal Note as security for another loan, or to transfer benefits to his family members. Plaintiffs also claim that Nevis and Cox were being "set up" for a deprivation of the finder's fee by virtue of this latest foreclosure clause. The true meaning and intent of this clause generates some of the requested discovery herein.

It should not be surprising, at this point, that further trouble in payment of the Leal Note occurred, and Leal then entered into an agreement to sell the Leal Note to Masana AG, a Liechtenstein corporation (whose only assets consisted of the Leal Note). Shortly after Leal sold the note, Masana foreclosed on the property, and Leal reaped a good profit, although not as much as he had initially envisioned on first sale of Barbican Farms. After Masana foreclosed, Nevis demanded that payment be made on the finder's fee.

Meanwhile, Nevis was being prosecuted civilly and criminally by the United States for activities that need not be detailed here, but which in some fashion involved the F.D.I.C. In pertinent part, the district court, Eastern District of California, appointed a receiver (plaintiff Davis) for Nevis' assets, and subsequently, all right title and interest in the Nevis finder's fee was awarded to the F.D.I.C. The F.D.I.C. in turn agreed with Davis that he would receive 4% of the finder's fee recovery. Meanwhile, Cox claimed that he held the superior interest in the finder's fee. The three plaintiffs, nevertheless, agreed to sort out their ownership interests after recovery from Leal.

Plaintiffs have sued Leal under three state law theories-breach of contract, unjust enrichment, and breach of implied covenant of good faith and fair dealing. For each of the contractual theories, plaintiffs seek the remainder owed on Nevis' half of the finder's fee—$375,000.00 plus interest. For the unjust enrichment claim, plaintiffs seek "at least" the $375,000.00.

*The Discovery Motion*

Even in its abridged, simplified form, this case presents a potential discovery juggernaut. Plaintiffs have sought information from Leal in interrogatories and requests for production concerning: Leal's tax records, Leal bank and business records, prior business dealings between Nevis and Leal, all facts and circumstances of the sale of the Barbican property, entities/individuals involved in the Barbican et al. transactions (including the Leal Family Trust), prior real estate management services unrelated to Barbican since 1985, including identification of individuals with whom business was conducted and agreements made, prior lawsuits, and more.[4] Plaintiffs contend that Leal's state of mind (bad faith) in making the second finder's fee modification is at issue, and that it is necessary to probe his past conduct as well as all facets of the Barbican et al. transactions to establish that state of mind. Moreover, it is necessary to identify all individuals with whom Leal had business contact, regardless of their relationship to the pleaded facts, who could speak to that state of mind. Plaintiffs also contend that parol evidence will be permitted to explain the facts and circumstances and intent surrounding execution of the finder's fee modification.

Leal, on the other hand, asserts various privileges under state law—tax records, privacy and trade secrets. He also contests the broad parameters of plaintiffs'

---

4. There are tens of specific discovery requests at issue. The court's rulings for each of the contested discovery requests appear in Appendix A. [Editor's Note: Appendix A not published.]

discovery requests in that California law narrowly defines what is at issue in the claims made in the complaint, and "state of mind" or "bad faith" are not pertinent to what are contractual claims. Plaintiffs, Leal contends, are essentially entitled to discovery related only to the transaction at issue, i.e., the modification of the finder's fee agreement just prior to the Masana foreclosure.

*Choice of Law*

■ Plaintiffs contend that this court has "original" jurisdiction over the [common law] claims of the receiver and F.D.I.C., and that therefore, this is a "federal question" case in which federal common law applies, including federal privilege law. With respect to application of federal law, in the words of a unanimous Supreme Court, plaintiffs are "so plainly wrong." *O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 83, 114 S.Ct. 2048, 2052, 129 L.Ed.2d 67 (1994). Because application of the correct law (state law) is very important to the discovery motion in many particulars, the court expends some discussion on this issue.

■ Although the court has original jurisdiction over the F.D.I.C. on account of its federal agency status, 28 U.S.C. § 1345, and that *for jurisdictional purposes,* all claims involving the F.D.I.C. in any capacity, with exceptions not pertinent here, "arise under the laws of the United States," 12 U.S.C. § 1819(b)(2), it is not true therefore, that federal law must be applied for all claims asserted by the F.D.I.C. in litigation.

This Court has recently discussed what one might call "federal common law" in the strictest sense, i.e., a rule of decision that amounts, not simply to an interpretation of a federal statute or a properly promulgated administrative rule, but, rather, to the judicial "creation" of a special federal rule of decision. *See Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 640–643, 101 S.Ct. 2061, 2066–2068, 68 L.Ed.2d 500 (1981). The Court has said that "cases in which judicial creation of a special

federal rule would be justified ... are ... 'few and restricted.'" *O'Melveny & Myers v. FDIC,* 512 U.S. 79, 87, 114 S.Ct. 2048, 2055, 129 L.Ed.2d 67 (1994) (quoting *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605 (1963)). "Whether latent federal power should be exercised to displace state law is primarily a decision for Congress," not the federal courts. *Wallis v. Pan American Petroleum Corp.,* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966). Nor does the existence of related federal statutes automatically show that Congress intended courts to create federal common-law rules, for "'Congress acts ... against the background of the total corpus juris of the states....'" *Id.* at 68, 86 S.Ct. at 1304 (quoting H. Hart & H. Wechsler, The Federal Courts and the Federal System 435 (1953)). Thus, normally, when courts decide to fashion rules of federal common law, "the guiding principle is that a significant conflict between some federal policy or interest and the use of state law ... must first be specifically shown." *Ibid.* Indeed, such a "conflict" is normally a "precondition." *O'Melveny, supra,* at 87, 114 S.Ct. at 2055. See also *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728, 99 S.Ct. 1448, 1458–1459, 59 L.Ed.2d 711 (1979); *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 98, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991).

*Atherton V. F.D.I.C.,* 519 U.S. 213, 117 S.Ct. 666, 670, 136 L.Ed.2d 656 (1997).

The *O'Melveny* case is particularly apt in that the F.D.I.C., as receiver, instituted an action claiming legal malpractice and breach of fiduciary duty against a law firm—claims typically asserted under state law, as is the situation here. In rejecting the F.D.I.C.'s contention that federal law would control by virtue of its federal agency status, the Supreme Court held that as a receiver, the F.D.I.C. was *not acting as the United States* but rather as an ordinary receiver which had stepped into the

shoes of the failed entity, *id.* at 83–87, 114 S.Ct. at 2053–2054; thus, there was no reason to apply a federal rule of decision. This was so despite the organization and authority given to the F.D.I.C. by the Financial Institutions Reform, Recovery, and Enforcement Act. The key legal issues would be decided by California law.[5]

The present action is one brought in part by the F.D.I.C. as receiver to collect a debt (finder's fee) that was allegedly due the person from whom the F.D.I.C. received its rights. As set forth above, the F.D.I.C. urges only state law claims in this action. There is no doubt after *O'Melveny* that state law will supply the rule of decision for all claims.

Moreover, the jurisdiction of the court over the receiver's (Davis) action is "ancillary" to the case in which he was appointed, not "original." 12 C. Wright, A. Miller, R. Marcus, *Federal Practice and Procedure*, § 2985 (West 1997). "The fact that the receiver was appointed by a federal court is not sufficient to raise a federal question." 12 C. Wright, A. Miller and R. Marcus, *supra*, at § 2984 at p. 40. *See also Mesa v. California*, 489 U.S. 121, 130–131, 109 S.Ct. 959, 965, 103 L.Ed.2d 99 (1989) (discussing with approval a prior case in which the fact of a federally appointed receiver did not give rise to a federal question.) Receiver Davis is also bound by state law in asserting his state law claims.

*The Correct Privilege Law to be Applied and General Discussion*

■ Leal raises a California tax records privilege, trade secrets privilege, general

privacy privilege, as well as relevancy/burden arguments. Having determined that state law will supply the rule of decision,[6] it follows that assertions of privilege will be governed by state law. Fed.R.Evid. 501 ("However, in civil actions ... with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, *government* ... shall be determined in accordance with State law.") (emphasis added).

The F.D.I.C. makes its analytical error in assuming that the quoted phrase applies only to actions founded on diversity jurisdiction. The rule does not provide that diversity jurisdiction actions are the only actions in which state law will supply the rule of decision. Cases involving the F.D.I.C. in which state law provided the rule of decision, and hence, the privilege law as well, include *In re Megan–Racine Associates, Inc. etc.*, 189 B.R. 562 (Bkrtcy. N.D.N.Y.1995); *Dietz v. U.S. (F.D.I.C.)*, 1992 WL 26712 (N.D.Ill.1992). An action such as this, whose substantive law is entirely that of the forum state, is not based on a federal court or statute "adopting" state law (as might be the argument under the Federal Tort Claims Act) such that federal privilege law arguably should apply[7], nor is it one in which the court is filling in the "interstices" of federal statutory phrases with state law. Rather, the action is one, pure and simple, in which state law supplies the rule of decision even though the federal court's jurisdiction may otherwise be "federal question" on account of federal agency status. Moreover, an

---

**5.** Those cases issued previous to *O'Melveny* which can be read to assert that a federal court is "free to fashion a federal rule of decision" simply because jurisdiction is predicated on § 1345, *see*, e.g., *U.S. on Behalf of Small Bus. Admin. v. Richardson*, 889 F.2d 37, 39 (3rd Cir.1989), are no longer viable. Similarly, although there were many cases prior to *O'Melveny* which easily found the existence of federal common law in federal question cases, such have been abrogated by *O'Melveny* as well. *See Atchison, Topeka and Santa Fe v. Brown & Bryant etc.*, 159 F.3d 358, 362–363 (9th Cir.1997); *Reliance Ins.*

*Co. v. U.S. Bank of Washington*, 143 F.3d 502, 505 (9th Cir.1998).

**6.** Of course, if plaintiffs had brought a federal statutory claim to which federal law would be applied on the merits, the "mixed" federal/state nature of the case would command that federal law ultimately apply to privilege questions. *Pagano v. Oroville Hospital*, 145 F.R.D. 683 (E.D.Cal.1993).

**7.** *See Menses v. U.S. Postal Service*, 942 F.Supp. 1320 (D.Nev.1996).

action which is entirely based on state law for its outcome does not require a uniform federal rule as to privilege in that the federal government has no overriding interest in privilege law for claims that have nothing to do with federal law.

Finally, it is not a meritorious argument that the courts should insert in a rule what a party believes was inadvertently, or even purposefully, omitted because that party has a "better" more informed view. The essential phrasing—that when state law supplies the rule of decision, state privilege law is applied—is not ambiguous on its face. If Congress had only wanted this phrase to apply to diversity actions, it knew full well how to provide for that, and would have made the rule read—that in actions founded on diversity of citizenship, state privilege law shall apply; in all other instances, federal privilege law shall apply. Congress did not, and this court will not.

*Tax Records Privilege*

■ Unlike federal law, *see Heathman v. U.S.D.C. (C.D.Cal.),* 503 F.2d 1032, 1035 (9th Cir.1974), California law affords a very strong privilege from discovery for tax records.

The seminal case involving the discoverability of tax returns by private litigants is *Webb v. Standard Oil Co.* (1957) 49 Cal.2d 509 [319 P.2d 621] (*Webb*). In *Webb,* the defendants in a tort case sought discovery of the plaintiffs' state and federal income tax returns. We construed Revenue and Taxation Code section 19282, which then provided in pertinent part that, except in tax enforcement proceedings, " '... it is a misdemeanor for the Franchise Tax Board, any deputy, agent, clerk, or other officer or employee, to disclose in any manner information as to the amount of income or any particulars set forth or disclosed in any report or return required under this part.' " (*Webb, supra,* 49 Cal.2d at p. 512, 319 P.2d 621.) The current section, although rewritten, is substantially similar in relevant respects. (*See Sav-On Drugs, Inc. v. Su-*

*perior Court* (1975) 15 Cal.3d 1, 6 [123 Cal.Rptr. 283, 538 P.2d 739].)

Although, by its language, this statute "appears to be directed only toward administrative officers, and does not expressly establish a privilege of the nature claimed by petitioner" (*Sav-On Drugs, Inc. v. Superior Court,* supra, 15 Cal.3d at p. 6, 123 Cal.Rptr. 283, 538 P.2d 739), we interpreted it in *Webb, supra,* 49 Cal.2d 509, 319 P.2d 621, to establish an implied privilege against forced disclosure in civil discovery proceedings. We noted that the purpose of the statute "is to facilitate tax enforcement by encouraging a taxpayer to make full and truthful declarations in his return, without fear that his statements will be revealed or used against him for other purposes. If the information can be secured by forcing the taxpayer to produce a copy of his return, the primary legislative purpose of the secrecy provisions will be defeated. The effect of the statutory prohibition is to render the returns privileged, and the privilege should not be nullified by permitting third parties to obtain the information by adopting the indirect procedure of demanding copies of the tax returns." (*Id.* at p. 513, 319 P.2d 621.)

Because of the overlap of information contained in federal and state tax returns, we also held that "forcing disclosure of the information in the federal tax return would be equivalent to forcing disclosure of the state returns and would operate to defeat the purposes of the state statute. It follows that the trial court did not err in refusing to require production of copies of either the state or federal tax returns." (*Webb, supra,* 49 Cal.2d at pp. 513–514, 319 P.2d 621.) This privilege against forced disclosure of tax returns has been reaffirmed in a variety of situations by both this court and the courts of appeal.

*Schnabel v. Superior Court,* 5 Cal.4th 704, 719–720, 21 Cal.Rptr.2d 200, 208–209, 854 P.2d 1117 (1993). *Schnabel* went on to hold that the privilege is not absolute.

"[T]he privilege is waived or does not apply in three situations: "(1) there is an intentional relinquishment, (2) the 'gravamen of [the] lawsuit is so inconsistent with the continued assertion of the taxpayer's privilege as to compel the conclusion that the privilege has in fact been waived,' or (3) a public policy greater than that of confidentiality of tax returns is involved." " *Id.* at 721, 21 Cal.Rptr.2d at 210, 854 P.2d 1117 (citations omitted).

■ In the current discovery dispute, plaintiffs make no claim that Leal has waived the privilege except to argue that blanket assertion of privileges are improper.[8] Nor can plaintiffs legitimately claim that Leal's defense is so antagonistic to the assertion of the tax record privilege that the court should find it constructively waived. Indeed as discussed below, plaintiffs' need for any financial documents unrelated to the transaction at issue is dubious at best. Finally, plaintiffs make no public policy argument whatsoever which would warrant the disclosure of records. Therefore, all discovery requests otherwise requiring the production of tax records, or information directly acquired from tax records, are inappropriate, and need not be the subject of further response.

*Trade Secrets*

■ Under California law, the owner of a trade secret has a privilege from disclosing it. Cal. Evidence Code § 1060. Like most privileges, the trade secrets privilege is not absolute, but requires a balancing of the need for protecting the secret with the needs of the case. *Raymond Handling Concepts Corp. v. Superior Court*, 39 Cal.App.4th 584, 590, 45 Cal. Rptr.2d 885, 888 (1995). The party asserting the privilege has the initial burden of establishing the existence of the privilege; the burden would then shift to the party seeking the information to justify the need for the information despite the privilege.

*Id.; see also Bridgestone/Firestone v. Superior Court*, 7 Cal.App.4th 1384, 1393, 9 Cal.Rptr.2d 709, 713 (1992).

■ Leal has not met his burden. A trade secret is not simply any material the withholding party would rather keep confidential, but is:

[S]ecret information *essential to the continued operation of a business or industry* [that] may be afforded some measure of protection against unnecessary disclosure.

Law Revision Comment to § 1060 (1995) (emphasis added).

Leal has provided no declaration, and even no argument, describing the material withheld, or why it is essential to his business. Indeed, aside from making a lot of money on land deals, the court is not entirely sure of the nature of Leal's business. The court will not therefore take into account any trade secrets privilege in adjudicating the discovery requests.

*Privacy and General Limits to Discovery*

■ The right to privacy in California primarily derives from the California Constitution's declaration that individuals have an inalienable right to privacy. Art. I § 1. The concept of privacy is extended to financial privacy in litigation, but the privilege is subject to balancing the needs of the litigation with the sensitivity of the information/records sought. *Valley Bank of Nevada v. Superior Court*, 15 Cal.3d 652, 657, 125 Cal.Rptr. 553, 555, 542 P.2d 977 (1975). Nonetheless, "even where the balance weighs in favor of disclosure of private information, the scope of disclosure will be narrowly circumscribed; such an invasion of the right to privacy must be drawn with narrow specificity and is permitted only to the extent necessary for a fair resolution of the lawsuit." *Moskowitz v. Superior Court*, 137 Cal.App.3d 313, 316, 187 Cal.Rptr. 4, 6 (1982) (citations omit-

---

**8.** Normally, the absence of a privilege log would be fatal to claimed assertions of privilege. However, the objection to producing tax records is sufficiently specific to satisfy the primary purpose of creating a privilege log—placing the other party on notice as to what specific information or documents are being withheld such that the parties (and the court) do not have to guess at the amount or type of withheld discovery.

ted). While the possibility of issuing a disclosure preclusion protective order may go some distance in ameliorating any untoward privacy invasion, the availability of limited protective orders *per se* does not automatically override privacy concerns. Generally, an entity will have less privacy rights than an individual. *Ameri–Medical Corp. v. W.C.A.B.*, 42 Cal.App.4th 1260, 1286–1288, 50 Cal.Rptr.2d 366, 383–384 (1996).

█ The burden to demonstrate the validity, or conversely, the invalidity of the privacy privilege, is hybrid. Where there is no doubt that the information requested implicates traditional notions of what is private information, e.g., associational records, the burden is on the requesting party to demonstrate that the information is directly relevant to the case, and that the information needs of the case outweigh the need for non-disclosure. *Britt v. Superior Court*, 20 Cal.3d 844, 859, 143 Cal.Rptr. 695, 704, 574 P.2d 766 (1978). However, where the privileged status of the information is unclear or doubtful, e.g., publicly known business contracts, the party asserting the privilege has the initial burden to establish that the information is encompassed within the privacy (or any) privilege. *Gonzalez v. Superior Court*, 33 Cal. App.4th 1539, 1550, 39 Cal.Rptr.2d 896, 902 (1995). Only then would any burden shift to the requesting party.

Information and documents which implicate private financial information are of the type that have been declared presumptively privileged. *Valley Bank of Nevada, supra.* The court utilizes the term "financial privacy" broadly and encompasses within that term not only bank records, but also documents generated in one's business affairs, e.g., contracts, business records and the like that have not received widespread dissemination, or have not been publicly filed. Financial documents or information that have been publicly disseminated on a wide basis retain little, if any, privacy protection, and will invariably be ordered disclosed if relevant. The court herein can make a request-by-request assessment of the type of information sought and declare some requested discovery as presumptively privileged, but afterwards, it is Leal's duty to determine (and identify) what other documents may be privileged. Leal must keep in mind that a general, undefined assertion of privilege will seldom, if ever, be effective.[9]

█ Although the federal discovery relevancy standard (applicable in state or federal claim cases) does not expressly limit discovery to the claims or defenses in a lawsuit. Fed.R.Civ.P. 26(b)(1) (permits discovery of information relevant to the "subject matter" of the lawsuit), the discovery limits of subsection 26(b)(2), when utilized, generally preclude discovery of information that is not fairly probative of the issues in a case either directly or indirectly. Discovery that is not necessary or significant in an evidentiary sense, nor reasonably calculated to lead to significant evidence, is not permitted. This is especially so where the information sought unduly burdens a responding party, or where disclosure of information may result in embarrassment. *See* the excellent discussion of discovery scope limitations of *In re Convergent Technologies Securities Litigation*, 108 F.R.D. 328, 331 (N.D.Cal.1985).[10] The analysis involved in application of the dis-

9. In the context of this case, however, the court will not penalize Leal for not having prepared a privilege log pursuant to Fed. R.Civ.P. 26(b)(5). As stated in the text, the privacy objection is intermingled with a general relevancy/burden objection. Given the extremely wide-ranging nature of the requested discovery, Leal properly awaited the outcome of this motion narrowing the type of information that could be sought before preparing a multi-page privilege log.

10. The court is aware that any limit on the scope of discovery into the "subject matter" is legal heresy to some, especially those generally on the propounding side of the issue. It is not the point here to debate all the permutations of "necessary" or "significant" discovery. However, this court views the changes in Rule 26(b)(2) as more than mere idle tinkering. The changes were designed to ferret out thoughtless discovery, and permit that discovery which shows a reasonable possibili-

covery abuse protections of Rule 26(b)(2) overlaps to a degree with the privacy privilege balancing, although California privacy protections are somewhat stronger, and may apply despite mere discovery relevance.

In making the necessary balance required by Rule 26, it is imperative that the needs of the case be accurately defined. The professed need for the financial information in this case revolves about the state law claims, and the evidence needed to prove/rebut same. While plaintiffs are correct that Leal cannot artificially delimit what is pled in the complaint in order to avoid discovery, it is also true that plaintiffs may not ignore what they have pled in the complaint, and are generally limited in discovery to what is pled in the complaint. Unreasonable extensions of theories in the complaint, not supported by any reasonable interpretation of the law, cannot stand as a basis for discovery. Therefore, a peek at the disputed elements of plaintiffs' claims, including potential remedies, is necessary.

■■■ Plaintiffs have only sued for two types of breach of contract (breach of the written contract and implied covenant of good faith and fair dealing)—and inconsistently, in quasi-contract for unjust enrichment.[11] For the contractual remedies, Leal's motive or other state of mind in breaching the agreement is not pertinent to the discussion.

> But the law generally does not distinguish between good and bad motives for breaching a contract. "[I]n traditional contract law, the *motive* of the breaching party generally has no bearing on the scope of damages that the injured party may recover for the breach of the implied covenant [of good faith and fair

dealing]; the remedies are limited to contract damages." (*Foley v. Interactive Data Corp., supra,* 47 Cal.3d at p. 699, 254 Cal.Rptr. 211, 765 P.2d 373, italics in original.) "Varying personal or economic reasons motivate one to breach his contract, but the general rule is that ... motives ... are immaterial and cannot be inquired into on the question of compensatory damages." (Note, supra, 8 Loyola L.A.L.Rev. at p. 327; see also *Harris v. Atlantic Richfield Co.* (1993) 14 Cal.App.4th 70, 82 [17 Cal.Rptr.2d 649] ["The imposition of tort remedies for 'bad' breaches of commercial contracts is a substantial deviation from the traditional approach which was blind to the motive for the breach."].)

*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal.4th 503, 516, 28 Cal. Rptr.2d 475, 482, 869 P.2d 454 (1994). *See also Freeman & Mills v. Belcher Oil Co.,* 11 Cal.4th 85, 44 Cal.Rptr.2d 420, 900 P.2d 669 (1995) (bad faith breach of contract does not permit recovery in tort). Thus, factual information relating to Leal's motive in deciding not to pay the finder's fee upon "conveyance" of his note is not appropriately considered under California law.

■■■ Even if plaintiffs may pursue the inconsistent "unjust enrichment" theory at the same time they proclaim the existence of a written contract, the remedy for such unjust enrichment is limited to the "benefit" derived from its wrongful retention. *Ghirardo v. Antonioli,* 14 Cal.4th 39, 51, 57 Cal.Rptr.2d 687, 693, 924 P.2d 996 (1996). From the pleaded facts, the only possible benefit owed to plaintiffs by Leal is the finder's fee itself. Plaintiffs have not sued in tort for fraud or other types of deceit.[12] By no legal or factual

---

ty of significance to a claim or defense in a case.

**11.** *Lance Camper Mfg. Corp. v. Republic Indem. Co. of America,* 44 Cal.App.4th 194, 51 Cal.Rptr.2d 622 (1996) (action in quasi-contract will not lie where there exists between parties a valid contract covering the same subject matter).

**12.** Plaintiffs belatedly assert in their discovery statement that they plan to seek permission to amend to plead a cause for fraud-in-the inducement-so that state of mind would become pertinent. Such a problematic amendment is not part of the case at this time, and at this stage of the litigation (discovery cutoff in approximately one month), plaintiffs are not entitled to base their discovery motion on specu-

stretch can plaintiffs have the court equitably renegotiate the finder's fee via an unjust enrichment claim based on alleged windfall profits accruing to Leal in order to make it greater than that which was agreed. "We do not have the power to create for the parties a contract which they did not make and cannot insert language which one party now wishes were there." *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman,* 65 Cal. App.4th 1469, 1478, 77 Cal.Rptr.2d 479, 483 (1998).

Despite the length and interesting complexity of the complaint,[13] the focus of the breach of contract and unjust enrichment claims is the failure to pay the *agreed* finder's fee upon the conveyance of the note and trust deed in the Masana transaction. *See* paragraphs 44, 54 and 61 of the 'Complaint. The defense to this assertion is the finder's fee "foreclosure forfeiture" provision. Plaintiffs go too far in arguing that all facts related to the initial Barbican transactions, and nearly every aspect of Leal's unrelated business transactions and personal business finances, may lead to the discovery of admissible evidence. Plaintiffs do not claim in the complaint that the initial finder's fee agreement was tainted by a lack of good faith and fair dealing or was breached prior to the Masana transaction—indeed, Nevis introduced the original buyers to Leal, and agreed that the principal of the buyer's group would receive part of the finder's fee himself. In any event, even if there were collusion on the part of Nevis and Leal to structure the Barbican Farms sale so that Leal would reap a

windfall profit to the detriment of Barbican Farms, to the extent that Nevis had dirty hands in the initial transaction—so does the F.D.I.C. standing in his shoes. Moreover, Nevis, through his son, was not compelled to enter into the finder's fee agreement as drafted; this was not alleged to be a contract of adhesion. In the context of the first finder's fee agreement, the foreclosure provision made sense as a legitimate protective device for Leal since Nevis was forwarding the buyers who were supposed to honor their obligations. It is not unconscionable or even surprising that Nevis should have borne the risk of their nonperformance in such a situation. Given the statement of the claims in the complaint, plaintiffs' expressed theory at hearing that they believe the entire contract between Leal and Nevis could be rescinded such that the finder's fee deal could be restructured, i.e., the F.D.I.C. could share in Leal's windfall profits in excess of the finder's fee for which it prayed, is neither supported by the complaint's legal theories or legitimate inferences from the facts therein. The court will not permit extensive discovery into all aspects of Leal's business transactions, and there is no doubt that the requested discovery is extensive, when there is no colorable legal basis to grant the enhanced relief sought.[14]

On the other hand, evidence related to the Masana foreclosure on the trust deed is especially pertinent in that it may disclose whether there was an actual or sham conveyance of the note which accelerated

lative theories that might become part of the case. Moreover, for the reasons expressed in the text below, the only potential fraud claim relates to the modification of the finder's fee agreement contemporaneous with the Masana transaction. The discovery pertinent to this claim would not extend to all aspects of the Barbican Farms transactions.

13. In a sense, plaintiffs attempt to bootstrap their discovery by pleading a great deal of background facts to the claims, and then profess to require a great deal of discovery with respect to the background facts. However, aside from the fact that the background

makes interesting reading, the background has no dispositive bearing on the actual claims made in the complaint which relate only to the second modification of the finder's fee agreement, and the alleged withholding of that fee.

14. Thus, this is one of those infrequent cases where the theory of recovery is so problematic that the discovery judge should review the merits of the theory to determine whether the party seeking discovery has *any* reasonable potential to prevail on the legal theory. To permit discovery on a non-viable recovery theory is to sanction discovery abuse.

payment of the finder's fee. Also, discovery is required to demonstrate whether there was a bona fide foreclosure which would wipe out the obligation to pay the finder's fee. If the Masana transaction were set up to create a foreclosure situation, there may well have been a breach of the covenant of good faith and fair dealing. Leal goes too far in suggesting that the ambiguities surrounding the finder's fee modification at the time of the Masana transaction are irrelevant. Plaintiffs are certainly entitled to inquire into the parol evidence that may corroborate their theory of breach.

Therefore, the court will permit discovery on all aspects of the finder's fee agreement and modifications thereto, analogous Leal transactions involving finders' fee provisions which may shed light on the "conveyance" or "foreclosure" terms of the agreement at issue, and the Masana transaction, including individual's/entities who may have had pertinent knowledge about the Masana transaction. In permitting this discovery, the court will make the appropriate privacy balancing with respect to specific information/documents sought.

IT IS SO ORDERED.